**HERMES CONSOLIDATED, INC. and Consolidated Subsidiaries, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 570–83T.

United States Claims Court.

March 4, 1988.

Buford P. Berry, Dallas, Tex., for plaintiffs. Thornton Hardie III, and Mary J. Clariday, Dallas, Tex., of counsel.

Ellen C. Specker, with whom was Asst. Atty. Gen. Roger M. Olsen, Mildred L. Seidman, Gerald Leedom, and Douglas A. Richards, Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

This is a tax refund case for income taxes of $727,830 in principal, $311,730.59 in assessed interest, and an uncalculated amount of accrued statutory interest thereon. These amounts represent net operating loss carry-overs deducted in 1978 by plaintiff under I.R.C. § 172 (1978), but denied by the Internal Revenue Service (the Service) on the basis of I.R.C. §§ 269 and 382 (1978).

The Service disallowed plaintiff's deductions on the basis of sections 269 and 382 because the Service believed that Hermes had undergone a substantial change in its line of business and at least a 50% change of control as a result of the combined acquisitions of stock and operating rights in Hermes during 1977. This opinion will, accordingly, focus on a review of the terms of these acquisitions during 1977 and on the business history of the Hermes corporation before and after this period. On the basis of the evidence submitted and witnesses heard at trial, as well as the stipulations of the parties, the court finds that the Service's disallowance of plaintiff's net operating loss carry-overs was incorrect and that plaintiff's claim for refund should, therefore, be granted.

### Undisputed Facts

1. *Background of Hermes Business Operations as a Wholly-Owned Subsidiary of Hermes Precisa International*

Hermes Consolidated, Inc. (Hermes) was a wholly-owned subsidiary of Hermes Precisa International, S.A. (H.P.I.) until 1977. During much of its existence, Hermes operated as a manufacturer and seller of office products such as typewriters, calculators, and adding machines. Hermes was also involved in the business of selling camera and movie equipment.

In the late 1960's and early 1970's, Hermes began to simplify its business activities. By 1969, Hermes terminated its involvement in camera and movie manufacturing and devoted itself solely to distribution. The sale of such equipment was later transferred to a newly-created and wholly-owned subsidiary called Paillard. Paillard continued to distribute these goods for a few years but subsequently ended its business activities in 1975. As a result, the only part of Hermes' business which remained operational was its distribution of office products.

During this period, the profitability of Hermes' line of office products began to rapidly decline. Hermes faced strong competition from I.B.M.'s new line of Selectric typewriters (known in the trade as "golf ball typewriters" since they used a golf ball sized element for printing rather than the standard key arrangement then in use). This product revolutionized the market and rendered the older models obsolete. Hermes' business suffered further adverse effects as a result of the overall decline in the economy due to the Arab oil embargo and the subsequent large increase in oil prices.

In order to survive, Hermes continued to distribute its calculators and adding machines but limited the distribution of its typewriters to lighter models. The lighter typing machines were able to serve different business needs than IBM's golf ball typewriters and thus still remained a prof-

itable sales item. H.P.I., Hermes parent, also began research and development on its own golf ball machine in 1971, but H.P.I. restricted the sale of that machine to the Swiss market in order to effectively respond to any initial problems which might normally accompany the production of any new design. Nevertheless, despite these efforts of Hermes and H.P.I., Hermes carry-over losses had accumulated to a total of $7,268,174 by the end of 1976.

### 2. Hamilton's Stock Option Purchase in Hermes

As a result of these losses, H.P.I. began considering the sale of part or all of Hermes. After several unsuccessful negotiations with various buyers, H.P.I. began negotiating the sale of Hermes stock with another corporation named Hamilton Brothers Oil Company (Hamilton).

These negotiations resulted in Hamilton's acquisition of a purchase option for shares of stock in Hermes. Under this option, Hamilton could require that Hermes' equity be recapitalized from 20,000 shares of common stock into a capital structure of 100,000 shares of common stock and 104,000 shares of preferred stock.

### 3. Hamilton's Purchase of a Refinery Located in Newcastle, Wyoming

While Hamilton was negotiating for the purchase of an option in Hermes' stock, it was also negotiating with Tesoro Petroleum Corporation (Tesoro) for the purchase of a refinery located in Newcastle, Wyoming. This Newcastle, Wyoming refinery had lost $236,000 during the 1976 fiscal year and over $1.3 million during the first half of fiscal 1977. Hamilton entered into a sales contract with Tesoro for the refinery on April 21, 1977; and the contract price for the refinery equalled $5 million in cash, plus the fair market value of available inventories related to the refinery at its closing, and finally, up to $2 million in earn-out payments if the refinery's gross profits reached certain levels.

In order to ensure the future profitability of the refinery as much as possible,

Hamilton applied to the Federal Energy Administration (FEA) to have the refinery placed into the FEA's Entitlements Program. This program, designed and available only for small refiners, provided a myriad of federal regulatory benefits. The benefit most sought by Hamilton was the ability to obtain certain preferences on the sale of its gasoline under then existing price control limits. Specifically, the program would enable Hamilton to sell its product at the maximum current market price, under what was called the "new item rule," instead of a lower rate which was normally used under "the legal entity rule."

On August 29, 1977, Hamilton's application for entry into the Entitlements Program was accepted in all respects except that the refinery was not given the right to utilize "new item rule" pricing. Instead of receiving "new item rule" pricing, Hamilton was given alternative relief from gasoline price controls through an allocation from the FEA's cost bank. This allocation allowed Hamilton to sell its product above the price control limits until the allocation was exhausted. This allocation was projected by Hamilton to be a rough equivalent to the "new item rule" pricing originally sought.

### 4. Hamilton's Exercise of its Stock Option in Hermes and Purchase Agreement with H.P.I.

On July 20, 1977, after Hamilton's purchase of the Newcastle, Wyoming refinery but before the refinery's acceptance into the FEA's Entitlements Program, Hamilton exercised its stock option in Hermes recapitalizing Hermes stock into 100,000 common shares and 104,000 preferred shares. Hamilton simultaneously entered into a purchase agreement with H.P.I. in which Hamilton purchased all of Hermes' common stock for $100,000. The preferred stock was not part of the purchase agreement and therefore remained under H.P.I.'s control.

Besides requiring the recapitalization of Hermes, the exercised stock option required the restatement of Hermes Certifi-

cate of Incorporation (the restated Certificate). Under the restated Certificate, all shares, whether common or preferred, were only entitled to one vote, but special voting majorities were required in certain circumstances. A majority vote of each stock group voting as a separate class was required for any change in Hermes' capital stock, for any declaration of bankruptcy, for any general assignment for the benefit of creditors, and for any further amendment of the restated Certificate. A two-thirds majority of each stock group voting as a separate class was required for the effectuation of any dissolution, merger, consolidation, or reorganization.

The restated Certificate provided Hermes with three directors and special voting rules for their election. Of these three directors, one was to be elected by the common shareholders, i.e., Hamilton; one was to be elected by the preferred shareholders, i.e., H.P.I.; and the last was to be elected from both groups of shareholders voting as a single class.

The restated Certificate created par values for the recapitalized stock in Hermes. The recapitalized common stock was given a par value of $1.00 per share, and the newly created preferred stock was given a par value of $2.20 per share.

The preferred stock had some additional differences with the common stock besides the higher par value. First, the preferred shares were entitled to a dividend of 6% per annum which was to become cumulative after January 1, 1982. Second, the preferred stock could be converted into common stock after January 1, 1986.

The most important difference between the preferred and common stock was that the preferred stock was redeemable by Hermes. The restated certificate provided that up to 5,000 shares of preferred stock could be redeemed on or after January 1, 1980, and that the remainder of the preferred stock could be redeemed on or after July 1, 1982.

In order for Hermes to declare the redemption of either the 5,000 shares or the remaining 99,000 shares of preferred stock, the restated Certificate required a majority vote among Hermes' three directors. The purchase agreement further provided that the "preferred stock's" director had to vote in favor of redemption when the "common stock's" director did the same. Thus, the combined effect of both the restated Certificate and the purchase agreement was to give Hamilton the power to unilaterally redeem the preferred stock since Hamilton had control over two out of the three vote majority necessary to effectuate a favorable vote for redemption.

The restated Certificate did require, however, that Hermes pay a certain cost for the redemption of each preferred share. Specifically, each preferred share could be redeemed at a cost of, as follows:

1. $2.20 per share, plus
2. 25% of the first $3,840,000 of pretax income earned after July 1, 1977,[1] reduced by 50% for all of the taxes payable by Hermes, and with the difference divided by 104,000, plus
3. Accrued but unpaid dividends earned on the redeemed preferred shares after July 1, 1982, plus
4. A 10% redemption premium on any share redeemed after June 30, 1983. The premium was to be increased to 20% with respect to any shares redeemed after June 30, 1985.

### 5. Hamilton's Exercise of its Operating Agreement with H.P.I.

On August 1, 1977, approximately one month after Hamilton's stock option and stock agreement were exercised, Hamilton entered into an operating agreement[2] with H.P.I. The agreement provided that the recapitalized Hermes corporation was to be operated under two separate divisions: the Products Division which consisted of the office products business previously owned by Hermes prior to the recapitalization;

---

1. In other words, this was an amount which could total up to $960,000.

2. This operating agreement was amended three times. For purposes of simplicity, the term "operating agreement" will be considered as including these amendments.

and the Refining Division which was designed to operate Hamilton's recently purchased Newcastle, Wyoming refinery.

Each division was to operate independently of the other during most day-to-day operations; each was to maintain their own books, and each was to maintain their own separate accounts for cash and securities. Each division also operated under a separate name; the Product Division continued to market itself as Hermes, but the Refining Division referred to itself as the Wyoming Refining Company instead. Lastly, the Products Division was not to rely entirely upon its own corporate structure for funds. Under the stock purchase agreement, H.P.I. was required to forgive $350,000 of loans due from Hermes and had agreed to contribute capital of $350,000 to reduce Hermes' bank debts. Furthermore, under the operating agreement, H.P.I. agreed to infuse working capital when needed, and H.P.I. was to promptly provide funds on demand when the net worth of the Products Division fell below $100,000.[3] The Refining Division, on the other hand, was not provided by Hamilton with any similar funding benefits.

There was one circumstance under the operating agreement in which each division could not act with total independence from the other. Specifically, the agreement prevented the Products Division from undertaking any payment or receipt in excess of $250,000 under a contract or under any other form of commitment without approval from the majority of the board. The restriction on the refining division was more limited; it could not undertake any such commitment in excess of $250,000 outside the normal course of the refining business as determined by Hermes' President or Vice President.

The operating agreement, like the purchase agreement, provided for the separation of H.P.I.'s control from Hermes in later years. The operating agreement included a repurchasing option in which H.P.I. could repurchase the entire assets of its Products Division. This option could be exercised between January 1, 1980 and January 1, 1981. The operating agreement also provided for a put option as well. Under the put option, Hamilton could require the repurchase of the Products Division by H.P.I. starting from February 1, 1980 until January 1, 1981.

The repurchase price of the Products Division to H.P.I. was to be $350,000, plus the assumption of the Products Division's liabilities. This price was to be reduced by 35% of such losses if the division produced net cumulative losses for the period from July 1, 1977 to the date of redemption, but in no instance was the price to fall below $215,000. If the Products Division produced net cumulative gains during the same period, the price was to be increased by 10% of the amount of such gains.

### 6. Hermes' Business Activities After its Recapitalization and Reorganization

The newly comprised board of directors consisted of: one director who was elected by the common stockholder, which was Hamilton; one director who was elected by the preferred stockholder, which was H.P.I.; and a third director who was elected by the majority of both classes of Hermes' stock. Soon after their election, this board of directors agreed to accept an assignment of Hamilton's contract with Tesoro for the purchase of the Newcastle Refinery. Thereafter, in October of 1977, the board purchased the refinery with a $5,000,000 loan borrowed from the Crocker National Bank. The board of directors borrowed an additional $3,000,000 from the Crocker National Bank, of which $1,936,961 was used for the purchase of the refinery's closing inventory.

Both divisions remained operational within Hermes for the next several years. The redemption option and the put option under the operating agreement were not exercised during the allowed periods in 1980 and 1981. Instead, on January 1, 1982, the Products Division, including all of its assets and liabilities, was removed from Hermes by transferring it to Paillard,

3. Hermes also could demand extra working capital from H.P.I. when Hermes' working capital fell below $75,000 for two consecutive fiscal quarters.

which, as stated earlier, was the wholly-owned subsidiary of Hermes that was left with no assets after the termination of its camera distribution business.[4]

Then, on August 15, 1982, in accordance with the restated Certificate and Hamilton's stock agreement with H.P.I., all of the preferred stock held by H.P.I. was redeemed by Hermes[5]. However, in lieu of the $2.20 portion of the redemption price per share, H.P.I. received all of Hermes' shares in Paillard.[6] Thus, the net effect of Hermes' shift of assets to Paillard and exchange of Paillard stock for H.P.I.'s preferred stock in Hermes was the complete severance of H.P.I.'s interest in Hermes.

### 7. Hermes' Net Operating Tax Loss Deductions Taken in 1978

As a result of the large amount of losses Hermes incurred because of a general decline in the economy during the oil crisis and because of Hermes' poor competition with I.B.M.'s golf ball typewriters, Hermes accumulated a large number of net operating loss carry-over deductions (carry-over deductions). *See generally* I.R.C. § 172. These carry-overs deductions had accumulated to $9,909,699 by the time of Hermes' recapitalization. In 1978, the year following the recapitalization, Hermes used these carry-over deductions in order to offset its income taxes by $727,830.

The Internal Revenue Service disallowed plaintiff's carry-over deductions, and it issued a notice of deficiency for the $727,830 amount. Plaintiff paid the alleged deficiency and filed an administrative claim for refund which was subsequently disallowed. Plaintiff then filed suit in this court in order to obtain relief.

### Discussion

Central to this dispute is the effect Hamilton's and H.P.I.'s three agreements had on the ownership of Hermes. It is defendant's contention that the stock option, stock purchase, and operating agreements be-

tween Hamilton and H.P.I. so changed the ownership and operation of Hermes that Hermes' carry-over deductions should be disallowed under Sections 269 and 382 of the Code.

Under I.R.C. § 269(a) (1978), a corporation's carry-over deductions will be disallowed where: (1) control over the corporation possessing the carry-over deductions was acquired by another corporation, and where (2) the acquiring corporation obtained that control for the principal purpose of avoiding tax. According to defendant, this is precisely what occurred in this case because control of Hermes, the corporation possessing the carry-over deductions, was acquired by Hamilton, and Hamilton acquired Hermes for the principal purpose of avoiding tax.

In most disputes involving I.R.C. § 269, the central issue revolves around whether or not the acquisition was principally motivated for the purpose of avoiding tax. In this case, however, plaintiff failed to raise this issue in its administrative refund claim. *See generally* I.R.C. § 6511 (1978). As a result of this failure, plaintiff can no longer assert that Hamilton's acquisition was not principally motivated for the avoidance of tax because of the doctrine of variance, which prevents the taxpayers from raising any assertion when seeking a refund in court when the taxpayer failed to make that assertion at the administrative refund level. *See Gindes v. United States*, 228 Ct.Cl. 632, 645, 661 F.2d 194, 202 (1981); *aff'd on other grounds*, 740 F.2d 947 (Fed.Cir.1984), *cert. denied*, 469 U.S. 1074, 105 S.Ct. 569, 83 L.Ed.2d 509 (1984). *See generally* F. Burnett & G. Kafka, Litigation of Federal Tax Controversies § 15.02 (1986).

Plaintiff concedes that the defect in its administrative refund claim had this preclusive effect. Yet, plaintiff contends that I.R.C. § 269(a) still does not apply because Hamilton never obtained the requisite control of Hermes as is required by that Sec-

---

**4.** Hermes' name was subsequently changed to Hermes Consolidated, Inc., and Paillard's name was subsequently changed to Hermes Products, Inc.

**5.** Known at this point in time as Hermes Consolidated, Inc.

**6.** Known at this point in time as Hermes Products, Inc.

tion. This dispute over whether or not control was acquired, unlike the issue of whether or not the acquisition was principally done for the avoidance of tax, was raised at the administrative level and therefore must be resolved by the court.

Section 269 of the Code recognizes two ways in which control can be established. First, control is considered established if the acquiring corporation has "at least 50 percent of the total combined voting power of all classes of stock entitled to vote." I.R.C. § 269(a). Second, control is to be established if the acquiring corporation has "at least 50 percent of the total value of shares of all classes of stock of the corporation." *Id.*

*Voting Control*

■ In determining whether the acquiring corporation has obtained 50% of the target corporation's voting power, the percentage of voting stock owned by the acquiring corporation is generally the critical factor. *See Jupiter Corp. v. United States*, 2 Cl.Ct. 58, 65 (1983). In this case, Hamilton never obtained 50% of the record ownership in Hermes' voting stock. After the recapitalization, Hamilton owned 100,-000 voting common shares and H.P.I. owned 104,000 voting preferred shares. Since both classes of stock were entitled to one vote per share, Hamilton only owned 100,000 votes out of the 204,000 total. In other words, Hamilton only owned 49.02% of Hermes voting power; 0.98% short of the 50% amount required to qualify under I.R.C. § 269(a).

■ Nevertheless, record ownership is not the sole criteria for determining voting power where there is other evidence to the contrary. *See id.* at 64–65; *see also Ach v. Commissioner*, 358 F.2d 342, 346 (6th Cir.) *cert. denied*, 385 U.S. 899, 87 S.Ct. 207, 17 L.Ed.2d 131 (1966) (decision holding that beneficial voting power is the essential thrust for control, and not literal record ownership, where taxpayer did not own the voting stock but in effect ran all the operations and made all the decisions of the corporation). *But cf.* B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders § 3.08, at 3–34 (3rd ed. 1979) (Under I.R.C. 368(c), "it is usually assumed that the computation of 'total combined voting power' is not to take account of shareholders' voting agreements or similar arrangements even though they may alter the balance of power; but the question is not foreclosed by case law or rulings.") Voting power is not merely the holding of voting stock shares. Rather, the ultimate expression of voting power is the ability to approve or disapprove of fundamental changes in the corporate structure, and the ability to elect the corporation's board of directors. L. Solomon, R. Stevenson, Jr. & D. Schwartz, Corporations Law and Policy ch. 3, at 26 (1982).

■ Upon review of all of the evidence, the court finds that while Hamilton came close to controlling the 50% amount of Hermes' voting power required to effectuate I.R.C. § 269, Hamilton never quite reached that key percentage. Hamilton did have 50% of Hermes' voting power when approving or disapproving fundamental corporate changes. In that regard, Hamilton had exactly the same ability as H.P.I. to effectuate or prevent such a change since each corporation could not act without the consent of the other. In order to amend the certificate of incorporation, change Hermes' capital stock, file for bankruptcy, or make a general assignment for the benefit of creditors, a majority of H.P.I.'s preferred shares and a majority of the Hamilton's common shares had to approve. In order to dissolve, merge, consolidate, or reorganize; two-thirds of the H.P.I.'s preferred shares and two-thirds of Hamilton's common shares had to approve.

The quantum of voting power in which Hamilton fell short of the 50% control required was in its power to elect Hermes' board of directors. Hermes had three members on its board. The majority of Hamilton's shares were entitled to elect one member. The majority of H.P.I.'s shares were entitled to elect another. The third member of the board was elected from the majority of all the shares voting as a single class. Since H.P.I. had 104,000 shares and Hamilton only had 100,000 shares, H.P.I. had the power to indepen-

dently elect the third member of the board. In measuring Hamilton's power to elect Hermes' board of directors then, Hamilton held a 33⅓% interest since it controlled only enough votes to elect one out of the three members. It is this failure to control 50% of the power in electing Hermes' board of directors which prevents the court from finding that Hamilton obtained the necessary 50% of voting power required under I.R.C. § 269(a).

Hamilton's failure to obtain 50% of the voting power in electing Hermes' board of directors is critical in the 50% voting power determination under I.R.C. § 269(a) for two reasons. First, Hamilton barely held 50% of the power to prevent fundamental changes in Hermes, and therefore Hamilton's lack of power in electing the directors of the board was sufficient to throw Hamilton's overall power in Hermes under the 50% mark. Secondly, the power to elect a corporation's board of directors is more indicative of voting power than the power to participate in fundamental corporate changes because the power to participate fundamental corporate changes is generally attendant with all stock ownership under local state law. *See* B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders § 3.08, at 3–34 (the critical factor in determining whether stock is entitled to vote under I.R.C. § 368(c) is the stock's ability to vote in the election of the board); Rev.Rul. 69–126, 1969–1 C.B. 218 (preferred stock qualified as voting stock under I.R.C. § 1504(a) since it could vote in elections for the board).

The defendant contends that Hamilton's inability to elect a third member should not persuade the court from finding that Hamilton held 50% of the voting power in electing the board of directors because H.P.I. exercised its power by voting for a director who was independent[7] of both Hamilton and H.P.I. Therefore, according to defendant, since both Hamilton and H.P.I. equally controlled one member of the board and the third board member was controlled by neither, Hamilton, in fact, shared equal power

over the board with H.P.I. Thus, defendant argues that this equal share should be considered as equivalent to the 50% voting power required under I.R.C. § 269(a).

The court finds the fact that H.P.I. voted for an independent director to be an unpersuasive equivalent to 50% voting control. There was no evidence presented to the court that H.P.I. was bound to vote for an independent director nor was there any evidence that H.P.I.'s unfettered power to vote for a third director was illegitimate. Even if oral evidence were produced that H.P.I.'s written voting power was a sham, the issue of sham is an issue which must be resolved against the government. *See Maxwell Hardware Co. v. Commissioner*, 343 F.2d 713, 720 (9th Cir.1965). At this point, it should be remembered that legally binding agreements affecting voting control are "too valuable … for the effectuation of innumerable commercial transactions to be … lightly impugned…." *Id.* at 721 (case involving a voting trust agreement).

Assuming arguendo that H.P.I.'s use of its voting power to elect an independent board member could be considered as a nullification of that power, defendant still fails to prove that Hamilton controlled 50% of the voting power in electing Hermes' board members. The third member was independent of both H.P.I. and Hamilton. "Independent" does not mean being equally subject to control by all, but rather "independent" means being subject to control by none. *See* Webster's New Collegiate Dictionary 584 (5th ed. 1977); *see also* Black's Law Dictionary 693 (5th ed. 1979) (independent is defined as "not subject to control … from a given outside source.") Therefore, Hamilton would still only be considered to have control over one out of the three members on the board; an interest in the board equalling merely thirty-three and a third percent.

In sum, it cannot be said that Hamilton obtained 50% of the voting power in Hermes. Hamilton only owned 49.02% of the record ownership in Hermes' voting

---

7. Having reviewed the testimony and the evidence at trial, this court finds that the third

director was, indeed, independent. Defendant has conceded as much in its post trial brief.

stock. Upon review of other evidence indicating voting control, Hamilton again came close but again fell short of the prohibited 50% limit. Hamilton did own 50% of the voting power to prevent corporate changes yet fell critically short of holding 50% of the voting power necessary to elect the board. It should be remembered that the ability to prevent fundamental corporate changes may also reside with small shareholder minorities in certain situations.

*Stock Value*

■ As discussed previously, there are two types of control which must be avoided in order for plaintiff to prove that Hamilton's acquisition did not fall within the confines of I.R.C. § 269(a). Besides proving that the acquiring corporation did not obtain 50% of the target corporation's voting power, the taxpayer must prove that the acquiring corporation did not obtain 50% of the value of the target corporation's stock. This question of valuation is one of fact, *e.g., Hamm v. Commissioner*, 325 F.2d 934, 938 (8th Cir.1963) *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964); 14 Mertens Law of Federal Income Taxation (Callaghan) § 59.01, at 5 [hereinafter Mertens], and the burden of proving this fact lies with the taxpayer. *E.g., Carpenter v. United States*, 7 Cl.Ct. 732, 736 (1985), *aff'd without opinion*, 790 F.2d 91 (Fed.Cir.1986); *Rosenberg v. United States*, 3 Cl.Ct. 432, 435 (1983).

■ The value of stock referred to under I.R.C. § 269(a) is its fair market value. *See Maxwell Hardware Co. v. Commissioner*, 343 F.2d at 720. Fair market value is not defined under I.R.C. § 269(a) nor under its attendant regulations, but its meaning has been widely established throughout the code. Specifically, fair market value is "the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under a compulsion to buy nor sell and both being reasonably informed as to all the relevant facts." 14 Mertens § 59.01, at 4; *accord e.g., Guggenheim v. Rasquin*, 312 U.S. 254, 257 n. 4, 61 S.Ct. 507, 508 n. 4, 85 L.Ed. 813 (1941); *Central Trust Co. v. United States*, 158 Ct.Cl. 504, 520, 305 F.2d 393, 402 (1962) (per curiam); *True v. United States*, 547 F.Supp. 201, 202 (D.Wyo.1982).

■ There is "little evidence [which] could be more probative [of fair market value] than the direct sale [or cost] of the property in question." *Estate of Kaplin v. Commissioner*, 748 F.2d 1109, 1111 (6th Cir.1984); *accord e.g., Goldstein v. Commissioner*, 298 F.2d 562, 567 (9th Cir.1962) ("cost is often considered persuasive (and frequently the best) evidence of fair market value."); *Estate of Fitts v. United States*, 237 F.2d 729, 731 (8th Cir.1956) (actual sales are the best criterion for fair market value). In this case, Hamilton purchased the stock in question at a cost of $100,000. This purchase becomes all the more persuasive as evidence of value in light of the fact that the date of the purchase is the same as the date of valuation.[8] *See e.g., Estate of Fitts v. Commissioner*, 237 F.2d at 731 (actual sales are determinative when they are within a reasonable time before or after the valuation date).

As for the value of the other stock not owned by Hamilton, i.e., H.P.I.'s preferred stock, its value can be measured by the cost which Hermes agreed to pay for its

---

8. Throughout this case, both parties have treated the valuation date and the acquisition date as occurring at the same time on July 20, 1977. This court will note that defendant need not have argued its position in this manner for Hamilton's acquisition of partial control in Hermes was performed by three agreements rather than through any single one. Hamilton may have purchased the 100,000 shares of stock on July 20, 1977, but it also signed a stock option and an operating agreement during a different time of that same year.

Yet, the stock option, signed on March 25, 1977, and the operating agreement, signed on August 1, 1977, were signed at approximately the same time as date of purchase. There were also no significant intervening events which occurred between these dates. Therefore, the fair market value on July 20, 1977, the date the stock was acquired, would still be reflective of fair market value even if the other dates were used instead. *See Estate of Kaplin v. Commissioner*, 748 F.2d at 1111 (a two-year difference in sale and valuation date was of no consequence where there is no intervening evidence of any event changing the value of the property between the two dates).

redemption.[9] The calculation of cost in this situation, however, is not an easy one since the calculation is divided into four separate steps, and all of these steps are based on different computations.

The first part of the formula requires Hermes to redeem the preferred stock at a cost of $2.20 per share or at a cost of $228,800 in total.[10] Under the second step of the formula, Hermes was required to pay up to 25% for its first $3,800,000 of pre-tax income. This amount, an amount which could reach up to $960,000, was then to be reduced by 50% for all the taxes payable on the first $3,800,000. In other words, the cost calculation under this second step depended very much upon the taxability of this first $3,800,000 of income, which, in turn, hinged very much upon the deductibility of Hermes' carry-over deductions taken prior to the recapitalization. The deductibility of these carry-overs, of course, is the subject of this dispute, and therefore, possible costs imposed by this second step will be ignored. If the court were to do otherwise, it would be forced into the awkward situation of assessing in hindsight the possible outcome of this litigation. The third step of the cost calculation required Hermes to pay all accrued but unpaid dividends. These dividends began accruing after January 1, 1982 at a 6% per annum interest, which was to be compounded quarterly. In light of the tax avoidance purpose of this transaction, it was safe to predict in 1977 that the redemption would have occurred at the earliest possible date which was on July 1, 1982.[11] The sum of these accruals at the 6% per annum rate by July 1, 1982, amounts to $6,864.[12] Lastly, under the fourth step, additional premiums were to be paid if the redemptions occurred after June 30, 1983. The court will ignore these possible premiums though because they, like much of the accrued dividends, were to be paid only if the stock was redeemed after the earliest possible redemption date.

Based on the above computations, the total expected cost in 1977 to redeem H.P.I.'s preferred stock in 1982 would be, as follows:

| | | |
|---|---|---|
| (step 1—$2.20 per share) | = | $228,800 + |
| (step 2—based on the possible tax on the first 25% $3,800,000 of Hermes income) | = | $ 0 + |
| (step 3—accrued dividends after July 1, 1982) | = | $ 6,864 + |
| (step 4—premiums if the stock is held after June 30, 1983) | = | $ 0 + |
| Total Cost of | = | $235,664 + |

There is one problem with this figure however. The redemption cost of the stock is for the year 1982 and not for the date of valuation on July 20, 1977.[13] Thus, the difference in timing must be considered since the value of money held in 1982 was greater than the sum of the same amount of money held in 1977. *See generally* Halperin, *Interest in Disguise: Taxing the Time Value of Money,* 95 Yale L.J. 506

9. Plaintiff has consistently claimed that the preferred stock was worth $228,800, which was an amount equal to its par value. Par value, though, is merely an arbitrary number, 14 Mertens § 59.26 at 80, and could scarcely be considered as a better estimate of a property's fair market value than the property's cost.

10. It is interesting to note that defendant could have asserted that the $2.20 portion of the cost formula established as part of the redemption price in the 1977 purchasing agreement was not truly reflective of cost because it was later substituted with the assets of the Products Division in a 1982 novation of that agreement. If defendant attempted to substitute the $2.20 portion of the formula with these office product assets, however, defendant would have had to prove that the $2.20 price per share was a sham to artificially increase the price of the preferred shares for the purposes of I.R.C. § 269(a). In the absence of any such argument or evidence though, the court finds the $2.20 per share a realistic figure.

11. Actually, 5,000 out of the 104,000 preferred shares could have been redeemed before July 1, 1982. Yet, for the sake of simplicity, and because it makes no difference to the outcome of this case, the earliest possible redemption date for all the shares has been assumed by both parties to fall upon July 1, 1982.

12. The sum of these accruals is based on the calculations of Dr. Spencer J. Martin, who is defendant's expert.

13. It should be remembered that 5,000 of these shares could have been redeemed before July 1, 1982, but were ignored for the sake of simplicity.

(1986); Cunningham, *A Theoretical Analysis of the Tax Treatment of Future Costs*, 40 Tax L.Rev. 577 (1985). Defendant's computations do take the time value of money into account and have assigned a discount rate of 12%. Applying this factor to the $235,664 amount, the discounted value of H.P.I.'s preferred stock could thus be said to be $133,723. Although this discount rate seems to be slightly high, this amount will be assumed for the sake of simplicity.[14]

Having reviewed both the cost of Hamilton's stock in Hermes and the value of Hermes stock owned by H.P.I., the court fails to find that Hamilton owned 50% or more of the value in Hermes' stock as is required by I.R.C. § 269(a). The purchase price of Hamilton's stock was $100,000 as compared to the present discounted redemption cost of $133,723. This amounted to a holding by Hamilton of only 42.8%; 7.2% short of the 50% required.

Defendant concedes that Hamilton cannot be considered a 50% owner in the value of Hermes' stock if the $100,000 cost of the common stock is compared with the $133,723 redemption cost of the preferred stock. Rather, it is defendant's contention that the $100,000 purchase price for Hermes' common stock was not truly representative of the common stock's fair market value because, according to defendant, the sale should not be considered as an arms length transaction. Although the weight of evidence is that this sale of Hermes' common stock was an arms length transaction,[15] there are grounds for questioning the truly representative nature of the common stock's sale price in this instance. Hamilton purchased more than just 100,000 shares of stock in Hermes. Hamilton also purchased a variety of voting, management, and redemption rights, and Hamilton then assigned its Tesoro refinery purchase contract to Hermes' operations.

The problem with these separate agreements is that their construct may have been an elaborate way of lowering the value of Hamilton's stock in Hermes in order to avoid I.R.C. § 269(a). If these other agreements had such an effect, it is clear that the cost of the common stock cannot be considered the sole criteria for determining value. *Cf. Gregory v. Helvering*, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1934) (mere devises in the form of a reorganization cannot be used to conceal the distribution of a dividend). Under the judicially created step transaction doctrine, a series of transactions must be "amalgamated into a single transaction when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching ... [an] ultimate result." *King Enterprises, Inc. v. United States*, 189 Ct.Cl. 466, 475, 418 F.2d 511, 516 (1969)

**14.** In the absence of alternative calculations, this court relies upon those calculations provided by defendant.

**15.** In its brief, defendant asserted that the transaction was not at arms length under the terms of Revenue Ruling 59–60, § 4.02(g) 1959–1 C.B. 241–42, as follows:

> Sales of a closely held corporation should be carefully investigated to determine whether they represent transactions at arms length. Forced or distress sales do not ordinarily reflect fair market value nor do isolated sales in small amounts necessarily control as a measure of value.

Although this court need not decide this issue, there are several problems with this argument. First and foremost, Revenue Ruling 59–60 was issued by the service for the purpose of making fair market valuations in the gift and estate tax area, and not for the purpose of making fair market valuations in the area of income taxes. Rev.Rul. 59–60, § 1, 1959.1 C.B. 237. Moreover, even if Revenue Ruling 59–60 were issued for the purpose of fair market valuations in the income tax area, it still would not invalidate the $100,000 purchase price of the common stock in this instance.

The fact that the sale was of closed corporate stock should not be determinative for the sale was made to a member of the general public. Revenue Ruling 59–60 was not intended to prevent these types of sales, but only those sales in a restricted market, such as: a sale to a family member, or to an employee. *See Central Trust Co. v. United States*, 504 Ct.Cl. at 519–20, 305 F.2d at 402.

Defendant also asserted that the sale was a forced sale since it was done in a state of liquidation. Yet, forced sales were only meant to include those situations similar to those resulting from a court order. *See* Mertens 27. Even if a liquidation sale were to be considered a forced sale, the facts do not indicate that Hermes ever reached the stage of liquidation.

(per curiam) (quoting Herwitz, Business Planning 804 (1966)). *See generally* Mertens §§ 43.91–92; Fed.Tax Coordinator 2d (Res.Inst.Am.) 22,397–22,400.

Hamilton's various agreements with H.P.I. and Tesoro were clearly a series of component transactions intended to effectuate a single result. As Hamilton is forced to concede because of the defect in its administrative claim for refund, Hamilton's acquisition of Hermes' stock was for the purpose of tax avoidance. Thus, it seems evident, in light of Hamilton's tax avoidance purpose and in light of the construct of its various agreements with Hermes, that Hamilton wanted to place the Tesoro refinery inside of Hermes' corporate shell for the sole reason of utilizing Hermes' carry-over deductions.

Yet, in order for Hamilton to successfully utilize these deductions, Hamilton could not simply acquire a majority interest in Hermes since it would trigger disallowance of the carry-over deductions under I.R.C. § 269. On the other hand, Hamilton needed a majority interest in Hermes if Hamilton wanted to retain a controlling interest in the operations and profits of the refinery.[16] Hamilton's response to these problems was to arrange its agreements in such a way as to avoid the pitfalls of both positions. While there is nothing improper in this action, it is the court's duty to scrutinize the transaction to insure it is not afoul of the limits set out in I.R.C. § 269.

Hamilton, accordingly, purchased less than 50% of the voting stock in Hermes in order to avoid I.R.C. § 269. At the same time, Hamilton sought to secure extra control over the refinery's operations through the use of special corporate structural mechanisms, as follows: by obtaining management direction over day-to-day operations in the refinery by requiring greater than normal voting majorities, by requiring special director election rules, and by creating put and redemption options for the Products Division.

As for the Tesoro refinery, it makes no difference how Hamilton affected its transfer because the value of the refinery was completely offset with debt. Had Hamilton made the purchase and then transferred the refinery with the debt assumed for its purchase, the value of Hamilton's stock in Hermes under I.R.C. § 269(a) would not have increased. The value of the refinery contributed to Hermes would be completely eliminated with the correspondent debt attached. Hamilton only entered into the contract for the Tesoro refinery but never actually made the purchase. Instead, Hamilton simply transferred the refinery contract to Hermes.[17] Hermes then purchased the refinery directly without any financial investment from Hamilton. The value of this direct purchase to Hermes was again eliminated by the assumption of debt.

It is obvious that the $100,000 purchase price of the stock cannot be viewed in isolation when valuing Hamilton's stock acquisition. The valuation must additionally include the possible effects of the other agreements. Special emphasis must further be made when considering the value of the refinery. The acquisition of the refinery should not be considered the usual proportional acquisition by all the shareholders but rather, because of the effect of the other agreements, the acquisition of the refinery should be solely attributed to the value of Hamilton's stock in Hermes.

---

**16.** Control over the earnings and profits of specific assets cannot be achieved by simply owning a proportionate interest in corporate stock. Stock ownership gives a shareholder a proportional interest in all of a corporation's property rather than a total interest in a particular asset. *See Wood v. Commissioner,* 75 F.2d 364, 366 (1st Cir.1935) (new shares of corporate stock do not generally represent full ownership in new assets but only a proportional interest in the corporate assets as a whole). Thus, a purchase of a mere percentage of stock without the use of other agreements would not have provided Hamilton with its desired level of control over the refinery division's assets.

**17.** No assertion or evidence was presented to the court which attempted to treat the value of the contract itself as an additional part of the common stock's purchase price. There is no reason to believe otherwise since Hamilton's assignment simply provided Hermes with a contract on the same terms as was originally provided to Hamilton.

Therefore, it is quite possible that the construct of these transactions had the effect of concealing part of the value which Hamilton held in Hermes. On the other hand, it should be noted that it is also quite possible that the $100,000 purchase price was reflective of the fair market value in the stock held by Hamilton. This purchase price may have included more than just the purchase of stock; the purchase price may have reflected the value of these other agreements as well as the anticipated acquisition of the Tesoro refinery. After all, Hamilton surely would not have paid $100,000 for a minority interest in a failing corporation.[18] Hence, the court finds that the purchase price is not as cogent a value of evidence as it is considered to be in most situations. Nonetheless, the purchase price is relevant and competent evidence; evidence which the court deems as sufficient to overcome the Commissioner's presumption of correctness and sufficient to shift the burden of proving the deficiency onto the government. *See e.g., Keogh v. Commissioner,* 713 F.2d 496, 501 (9th Cir. 1983); *Demkowicz v. Commissioner,* 551 F.2d 929, 931 (3rd Cir.1977).

It should be noted that plaintiff did not rely solely upon the purchase price to support its position that the common stock had a fair market value of $100,000. Plaintiff also presented an appraisal and testimony by Mr. Bryan Lawrence; a witness who was recognized by the court as an expert in valuating stock assets, and one who showed himself to have particular expertise in the field of oil and gas.

According to Mr. Lawrence's appraisal, which was a book value[19] balance sheet determination of Hermes' assets at the time of the sale, Hermes had assets of $1,263,000 and liabilities of $926,000 which when added together gave Hermes a net worth of $337,000. The values of the common and preferred were then allocated according to par value. The common stock had a par value of $1.00 per share or $100,000 in total, and the preferred stock had a par value of $2.20 per share or $228,800 in total.[20] Mr. Lawrence then testified that the $100,000 par value of the common stock as compared with the $228,800 par value of the preferred was reflective of the relative fair market worth in both classes of stock. Mr. Lawrence believed that such a comparison was reflective because the par value was established at arms length and because of the preferred stock's voting majority, conversion rights, liquidation preferences, cumulative dividend rights, and available redemption options.

Mr. Lawrence's testimony considered the impact on the value of the common stock which may have resulted from Hermes' later acquisition of the Tesoro oil refinery and its related assets. Since the purchase was accomplished entirely with debt, Hermes' additional refinery assets were completely offset by a corresponding increase in Hermes' liabilities. The end result being that no increase, under any proper book method of valuation, could have existed with respect to Hamilton's shares of Hermes' common stock for there was no increase in Hermes' net worth.

Although the court does not dispute the expertise of Mr. Lawrence, it does have a problem with Mr. Lawrence's reliance on book value. Book value calculations may be the correct method for determining a corporation's value according to principles of financial accounting, but it should be remembered that correct methods of valuation under financial accounting and correct methods of valuation under tax accounting are not necessarily the same. *See general-*

---

**18.** The $100,000 value also cannot be considered related to the carry-over deductions which plaintiff claims it is entitled to in this case because their value was to be recovered under the purchase agreement when H.P.I. redeemed its stock.

**19.** Plaintiff originally argued that Mr. Lawrence's appraisal was based on the value of Hermes' net assets. In its post trial reply brief, however, it argued that the appraisal was also equivalent to a book value determination since the assets were appraised near the sale date.

**20.** It should be noted that plaintiff's book value calculations do not entirely add up. Mr. Lawrence valued the company at $337,000, but the total stock in the corporation was valued only at $328,800 ($100,000 for the common and $228,800 for the preferred).

*ly* Dubroff, *Tax Accounting: The Relationship of Clear Reflection of Income to Generally Accepted Accounting Principles*, 47 Alb.L.Rev. 354 (1983) (financial accounting and tax accounting often have different computations). When making a fair market valuation for the purposes of the tax code, book value is only one of three factors to be reviewed; a corporation's dividend yield and earnings must also be considered. *See Righter v. United States*, 194 Ct.Cl. 400, 412, 439 F.2d 1204, 1210 (1971) (citing *Central Trust Co. v. United States*, 194 Ct.Cl. at 533–34, 305 F.2d at 410–11). Moreover, upon review of these three factors, book value has consistently been held to have the least weight. *See Id.*

The second problem with relying upon the book method of valuation is that this method's probative weight is greatest when the valuated business is in liquidation. *See Fehrs v. United States*, 223 Ct.Cl. 488, 509, 620 F.2d 255, 266 (1980) (per curiam) (citing *Righter v. United States*, 194 Ct.Cl. at 412, 439 F.2d at 1210). In this case, Hermes' Products Division and oil refinery had not liquidated operations but remained as going concerns. The Products Division may have been operating at a loss for quite some time but continued to service its warranty claims and continued to sell its calculators and light office typewriters. The oil refinery also operated at a loss, but it too continued operations. Furthermore, both businesses had an opportunity for revival. The Products Division was expecting increased business as a result of the anticipated advent in June and July of 1977 of H.P.I.'s new line of 808 Hermes golf ball typewriters. As for the oil refinery, it had become more competitive as a result of its acceptance into the FEA's Entitlements Program.

Lastly, the fact that plaintiff's calculations are virtually the same as those for par value is not strong support for its position. "The par value of ... stock is [merely] an arbitrary dollar amount stated in the [corporation's] articles of incorporat[ion].... It bears no relationship to the stock's [fair market] value." *Id.* 77 n. 8. *See generally* 14 Mertens § 59.26, at 80. Problems with the use of par value are evident in this case. The common stock/preferred stock 1:2.20 par ratio's probative value is relatively weak despite the expert testimony of Mr. Lawrence. The preferred stock may have had several preferences over the common, yet many of these preferences were illusory. This is because the preferences held by the preferred were only effective on or after July 1, 1982; and July 1, 1982, it should be remembered, was the first date on which the preferred stock could be redeemed.[21] Other of these so-called preferences, such as the redemption and put options for the Products Division and the preferred stock, were created more for the benefit of the common stock than for the benefit of the preferred.[22] Finally, the 1:2.20 par ratio of the common stock to the preferred was not reflective of the relative voting power of both classes after the recapitalization. As discussed earlier, Hamilton was not merely a minority shareholder; rather, Hamilton was a minority shareholder which had the benefit of a variety of voting mechanisms designed to give it veto power over most corporate actions.

However, upon a review of all of the evidence, the court still finds the $100,000 purchase price to be the most persuasive evidence of the common stock's fair market value. While this evidence is not overwhelming, it is certainly sufficient to shift the burden of proof to the defendant.

Where the purchase price or cost may not necessarily be determinative of the fair market value of property, the next strongest evidence is the property's projected earnings. *See* 14 Mertens § 59.23, at 72. *See also Fehrs v. United States*, 223 Ct.Cl. at 509, 620 F.2d at 266 (market value of a going concern derived from those ingredi-

---

**21.** Moreover, it should be remembered that 5,000 of these shares could be redeemed even before there was an opportunity for them to accrue at all.

**22.** It is clear that these options were constructed so Hamilton could sever its relations with H.P.I. after it successfully used Hermes' carry-over losses.

ents bearing upon the business' future earnings capacity). This was the type of evidence which defendant produced at trial in order to prove that Hamilton's stock in Hermes was worth more than the $100,000 purchase price.

Defendant first presented a set of earnings projections which Hamilton used in its application to the FEA Entitlements Program. These figures, according to defendant, showed that Hamilton's indirect control over the refinery obtained through its purchase of Hermes' common stock was alone worth more than the common stock's $100,000 purchase price. The problem with applying these projections to this case, however, is that they were not designed for the purpose of measuring the refinery's fair market value. These projections were instead designed to compare the difference between the refinery's future earnings if assisted by the FEA Entitlements Program with the refinery's future earnings if it had to continue without that assistance. As a result, these projections had to assume that certain crucial variables would remain constant: general gasoline prices, the refinery's sales volume, and the level of the FEA's entitlements. Moreover, other variables, such as the possible termination of the FEA Entitlements Program and the possible cost of capital improvements to meet future E.P.A. standards, had to be ignored. In light of these assumptions, this valuation for the FEA must be considered as meaningless, for these assumptions, in effect, totally disregarded the refinery's associated risks.

In addition to the earnings projections used by Hamilton for the FEA, defendant also presented a second set of earnings projections which were prepared by its own expert, Dr. Spencer Martin. Dr. Martin's valuation of Hamilton's controlled common stock in Hermes was calculated by capitalizing Hermes' projected earnings under the following three part formula:

Part (1)

All of Hermes' assets [times] Hermes' expected rate of return in its assets = Hermes' projected yearly net income.
and part (2)
Hermes' projected yearly net income under step (1) [times] Hermes' price earnings ratio = the total fair market value of Hermes' stock.
and part (3)
The total fair market value of Hermes' stock [minus] the fair market value of Hermes' preferred stock = the fair market value of the common stock in Hermes controlled by Hamilton.

Under part one of the formula, Dr. Martin appraised the assets of the refinery at $7,000,000.[23] Next, he obtained an expected reported rate of return on these assets from a study done by *Bonner and Moore*, an association which was formed to assist petroleum and chemical processing plants. The *Bonner and Moore* study reported a rate of return at .076 for a refinery of the size owned by Hermes.[24] When the .076 reported rate of return was multiplied by the refinery's $7,000,000 worth of assets as was required under part one of the formula, Hermes' net income was calculated to be $532,000 per year.

Not fully satisfied with these calculations though, Dr. Martin modified the numbers to some extent in order to take into account some specific aspects of Hermes' particular corporation. He did this by averaging the $532,000 amount with the $407,473 income projection estimated by Hamilton in its application to the FEA. The resultant determination for income was therefore expected to be $469,737.

It should be remembered that Hermes also was the owner of the Products Division. Dr. Martin did not rely upon a study for his figures as he had done with the refinery but made a rough approximation instead. Although Dr. Martin expected Hermes to continue losing money as it had in the past, he found it significant that Hermes could demand H.P.I. to cover all of its losses over $100,000. Based on this

---

23. The actual value of the refinery and its inventory on hand at closing was $6,936,961.

24. Hermes' refinery fell in the category of a refinery which was expected to produce 10,000–30,000 barrels a day.

fact, Dr. Martin estimated that Hermes would probably suffer a loss of $50,000 per year. Thus, Hermes' net income was adjusted downwards by $50,000, which gave Hermes a projected net income total of $419,737 for the combined divisions.

As required by part two of the formula, which converts Hermes' net income projections into a purchase price for the total value of its stock, the $419,737 amount had to be multiplied by Hermes' price earnings ratio. This ratio converts the future value money into a present value; a calculation which reflects the time value of money and which reflects the risk of the investment. In this case, Dr. Martin expected the amount of risk in Hermes' refinery [25] to be somewhat high because oil and gas extraction is a volatile field, but he also expected this risk to be cushioned to some extent by the government's entitlements. Therefore, since a safe investment, like treasury bonds, yielded a 7% return in 1977, Dr. Martin estimated the refinery's projected yield at 15%. This number converted into a multiplier of 6.7 on a 100 point scale.[26] Returning to the calculations under part two of the formula, the 6.7 price earnings ratio multiplied by the $419,737 net income amount equalled a total value in Hermes' stock of $2,812,238.

Finally, in order to differentiate between the value of Hermes' common stock from Hermes' total stock as required by part three of the formula, Dr. Martin subtracted the preferred stock from the $2,812,238 amount. Dr. Martin did not expect the preferred stock to share in the corporation's proceeds beyond what was required by the redemption agreement and therefore considered the preferred to have the value of its cost at redemption. As discussed

earlier, the preferred stock's cost was discounted to a present value of $133,723. Accordingly, the $133,723 value of the preferred stock was subtracted from the $2,812,238 total which left the common stock with a value of $2,678,515. Dr. Martin then subtracted 10% of the value of the common stock in order to cover the costs of transfer. The value of the common stock which remained was 2,410,663; a value approximately eighteen times greater than the preferred.

Although Dr. Martin's calculations are logical, the court has problems with the accuracy of their results. Dr. Martin may have been an expert in making general corporate and financial stock valuations, but he failed to show any special expertise in the business of oil and gas. While the court believes that such special expertise is not generally required in valuating oil and gas corporate stock, special expertise in the field of oil and gas is essential in this situation where the stock is closely tied to the unique benefits and obstacles of the particular business itself. Also, this time period was a critical and unique one in the oil and gas industry.

Dr. Martin's lack of specific expertise was apparent in his calculations. Most of his calculations were simply based on industry averages rather than based on an analysis of the refinery itself.[27] As a result of this, Dr. Martin overlooked many of the risks that the refinery had to overcome. First, Dr. Martin failed to recognize that the refinery was faced with stiff competition from seven local refineries. Second, he failed to consider the condition of the refinery, which was in a state of disrepair. Lastly, he failed to consider the possible future costs of impending environmental

---

**25.** The Products Division was ignored in this price earnings ratio. Dr. Martin perhaps ignored this division in the ratio because it was only expected to lose money.

**26.** The 6.7 multiplier amount fell 0.3 points below the Bonner and Moore average of a refinery expected to produce 10,000–30,000 barrels a day. Dr. Martin's reason for this lower figure seemed to be that the refinery had the benefit of the FEA Entitlements Program.

**27.** The only way Dr. Martin tried to incorporate the specifics of the refinery was by averaging his projections with those used by Hamilton in its calculations made to the FEA Entitlements Program. This average clearly cannot be considered a sufficient analysis of the specifics of the corporation. This is especially so where Hamilton's calculations themselves were of little utility in making an overall fair market valuation of Hermes' common stock.

regulations.[28]

There were other problems with Dr. Martin's calculations besides those stemming from his lack of expertise in the field of oil and gas. The most significant of these other problems was Dr. Martin's overvaluation of the FEA Entitlements Program. He overestimated the program by first assuming that it was free from risk of termination or of alteration. Such assumptions were not properly made, however, since the regulations in the field of oil and gas were subject to great change during this period. As a matter of fact, the FEA Entitlements Program was terminated in the early 1980's as a result of the policy of deregulation. His second overestimation of the program was his failure to consider the possibility that other local refineries would be receiving benefits from the same program. For several months after its recapitalization, Hermes did, indeed, suffer further losses from this kind of competition.

The other significant problem that the court had with Dr. Martin's calculations was their total disregard of the refinery's prior losses. The refinery's prior losses may not have been entirely reflective of future earnings over the long term where the business enterprise changed its management, was infused with capital, and given governmental assistance, *see Central Trust Co. v. United States*, 158 Ct.Cl. at 521, 305 F.2d at 403 ("[p]ast earnings are significant only insofar as they reasonably forecast future earnings"), but such losses were still indicative of future earnings during the short period of transition. After all, it takes time for management, even with the assistance of new capital and governmental benefits, to turn a failing enterprise around. Hermes' expected income should, therefore, have been reduced during the early period after its recapitalization in order to take this transitional period into account.

Having reviewed both parties' arguments made at trial, the court finds the arms length open market transactions between Hamilton and H.P.I. more persuasive than the mechanical textbook valuations computed by both parties' experts. This leaves Hamilton with a value of $100,000 in Hermes' stock out of a $233,723 total.[29] Thus, since Hamilton failed to acquire 50% of the value in Hermes' stock, and since, as discussed earlier, it failed to obtain 50% of the voting power in Hermes, the I.R.C. § 269(a) disallowance of Hermes' carry-over deductions cannot be found to apply.

*Application of I.R.C. § 382.*

Defendant argues in the alternative, that even if I.R.C. § 269(a) is not applicable to this situation, that Hermes' 1978 carry-over deductions should be disallowed on the basis of I.R.C. § 382. *See Princeton Aviation Corp. v. Commissioner*, 47 T.C.M. (CCH) 575, 585 (1983) (citing Treas.Reg. § 1.269–6 (1982)), *nonacq.*, 1965–2 C.B. 7. I.R.C. § 382, like I.R.C. § 269(a), also denies the use of carry-over losses once a certain type of acquisition of stock has taken place. In order for a transaction to fall under I.R.C. § 382, the transaction must have fulfilled two basic requirements.

The first requirement of I.R.C. § 382 is that Hamilton, the purchasing corporation, must have experienced a 50% point increase in the fair market value of Hermes', i.e., the target corporation's, stock. I.R.C. § 382(a)(1)(A) (1978). This 50% point increase must have occurred within a two-year period beginning one year prior to the

---

**28.** It should be noted that the court is not requesting that Dr. Martin consider an event which occurred after the date of valuation. *See generally Central Trust Co. v. United States*, 158 Ct.Cl. at 520, 305 F.2d at 403 (("'The valuation of the stock must be made as of the relevant dates without regard to events occurring subsequent to the crucial dates.'") (quoting *Bader v. United States*, 172 F.Supp. 833, 840 (S.D.Ill. 1959)). The only fact which Dr. Martin should have considered in his appraisal was the possibility that such an event would have occurred.

**29.** This court accepts plaintiff's valuation of Hermes' common stock at $100,000. With respect to the preferred stock, this court finds defendant's figure to be more realistic than plaintiff's valuation at $228,800 since it takes the time value of money into consideration. The court has also chosen defendant's valuation of the preferred because it provides the weakest case for plaintiff under I.R.C. § 269(a), and plaintiff still prevails. Therefore, there is no need to put undue importance as to which valuation of the preferred ought to be accepted.

year in which the carry-over deductions were claimed. *Id.* The increase must also have been attributable to the purchase of Hermes' stock or attributable to a decrease in its total stock outstanding. I.R.C. § 382(a)(1)(B) (1978). The second requirement of I.R.C. § 382 is that Hermes, the target corporation, must not have continued to carry on substantially the same trade or business after the 50% point increase as it did prior to that increase. I.R.C. § 382(a)(1)(C) (1978).

■ Because Hamilton held no stock in Hermes before the transaction in issue, the analysis of the 50% point increase requirement is essentially the same in this case as the 50% value control requirement of I.R.C. § 269. The only difference that exists between the application of both sections is the valuation date. Under I.R.C. § 269, the court reviewed Hamilton's percentage of control based on the value of Hermes' stock as of July 29, 1977, the date when Hamilton acquired Hermes' common stock. Under I.R.C. § 382 however, the valuation date is the year in which the carry-over losses were deducted and the prior year before that. Therefore, because the carry-over losses in dispute were deducted in 1978, the valuation date under I.R.C. § 382 ends on December 31, 1978 and begins on January 1, 1977.

Both parties agree that Hamilton had no ownership in Hermes' stock prior to the recapitalization on July 29, 1977. As the court has already determined above, Hamilton also did not obtain a 50% point interest in the value of Hermes' stock as a result of the recapitalization. The question then becomes whether Hamilton obtained any additional increases after July 29, 1977, which could be attributable to the purchase or reduction of Hermes' stock.

No evidence of any such purchase or reduction was shown or even alleged in this case. The only possible increase which Hamilton could have had in Hermes' common stock was due to a general appreciation of the common stock itself. This type of increase, however, was not the type of increase which was envisioned by I.R.C. § 382(a). *See* B. Bittker & J. Eustice, Fed-

eral Income Taxation of Corporations and Stockholders, 16.22, at 16–57 ("The language of I.R.C. § 382(a)(1)(B) suggests that the statutory increase must be attributable to the purchase or redemption transactions, rather than to general 'market rises,' but the regulations are silent on this point.") Rather, I.R.C. § 382(a) was only meant to include those increases which were the direct result of a taxable (recognizable) event or exchange, Rev.Rul. 77–81; 1977–1 C.B. 97; Rev.Rul. 75–249; 1975–1 C.B. 125, and a general market rise is clearly not considered a taxable event or exchange. *See* I.R.C. § 1001(a–c) (1978). There was, accordingly, no 50% point increase in this case because Hamilton only acquired 49.02% of the value in Hermes when it purchased Hermes' common stock and because there was no increase attributable to a purchase or redemption of the stock after that date.

■ Even assuming arguendo that a 50% point increase did occur, the second requirement of I.R.C. § 382(a) was not met since no substantial change occurred in Hermes' trade or business. The fact that Hermes purchased an oil refinery does not change this result. This is so because the addition of a business does not, in and of itself, make the change in a corporation's trade or business substantial even if that new line of business is radically different from the other existing businesses. *Accord* Treas.Reg. § 1.382(h)(8) (1978); *Commissioner v. Goodwyn Crockery Co.*, 315 F.2d 110, 112 (6th Cir.1963) (the additional line of dry goods added to plaintiff's houseware line was not a substantial change); *American M.A.R.C., Inc. v. United States*, 67–1 U.S. Tax Cas. (CCH) ¶ 9277 at 83, 654 (C.D.Cal.1967) (the addition of a petroleum exploration and development business to the business of manufacturing engines was not a substantial change); *Power–Line Sales Inc. v. Commissioner*, 36 T.C.M. (CCH) 190, 196 (1977) (the addition of the business of nailers to the oil electronic detection business was not a substantial change). Moreover, a substantial change will not be deemed to occur even where all of the accrued carry-over losses from the

prior business are applied to the new business. *See* S.Rep. No. 94–938, 9th Cong., 2d Sess. 446 (1976), U.S.Code Cong. & Admin. News 1976, p. 2897.

■ Defendant argues, however, that other changes were made to Hermes' operations besides the addition of the refinery. These other changes asserted by defendant only relate to Hermes' prior office products operations and, therefore, could be considered substantial within the meaning of I.R.C. § 382(a). Yet, it should be remembered that not all changes are significant enough to be considered substantial. The statute does not require absolute rigidity nor does it require a corporation to pursue exactly the same ends after the acquisition as it did before. *Glen Raven Mills, Inc. v. Commissioner*, 59 T.C. 1, 12 (1972) (citing *Goodwyn Crockery Co. v. Commissioner*, 37 T.C. 355 (1961)), *aff'd*, 315 F.2d 110, *acq. in result*, 1973–2 C.B. 2; *e.g., see H.F. Ramsey Co. v. Commissioner*, 43 T.C. 500, 514 (1965) (citing *Goodwyn Crockery Co. v. Commissioner*, 37 T.C. at 355, *aff'd*, 315 F.2d 110); *Princeton Aviation Corp. v. Commissioner*, 47 T.C.M. (CCH) at 586. After all, if such rigidity was required, "good management would be helpless to change past practices to revive a failing corporation." *Coast Quality Construction Corp. & Sub. v. United States*, 325 F.Supp. 500, 505 (1971), *aff'd*, 463 F.2d 503 (5th Cir.1972).

The most significant change asserted by defendant was the change in the type of product which Hermes sold. Specifically, Hermes' office products operations no longer generated most of their sales from light office typewriters but instead from the newer heavier Hermes model 808. This was a change which could hardly be considered significant, let alone substantial, for the basic product remained the same, "only the brand and model sold were changed." *Princeton Aviation Corp. v.*

*Commissioner*, 47 T.C.M. (CCH) at 586. *See Commissioner v. Goodwyn Crockery Co.*, 315 F.2d at 112 (the conversion of part of a wholesale houseware business to retail was not substantial); *Glen Raven Mills, Inc. v. Commissioner*, 59 T.C. at 12–13 (the conversion of equipment from producing full-fashioned hosiery to making full flat fabric was not substantial).

■ Defendant also asserted that Hermes' prior office products operations had been substantially modified after Hamilton's acquisition because the Products Division had increased its sales volume and had changed some of its employees. The court, however, is hard pressed to find a substantial change merely because the prior line of business had increased its volume of sales. Such a finding is counterintuitive, in fact, where the purpose of the statute was to prevent the purchase of a new business simply so that it could be discarded rather than continued or revived. *See* H.R.Rep. No. 1337, 83d Cong., 2nd Sess. pt. 1, at 41–42 (1954), U.S.Code Cong. & Admin.News 1954, p. 4025. Defendant's other assertion, that a substantial alteration occurred because the Products Division changed its employees, is stronger, but it, too, cannot stand in light of the facts of this case.[30] *See generally* Treas.Reg. § 1.382(a)–1(h)(5) (1978) (facts and circumstances test—some of the factors, among others, to be reviewed are the changes in the corporate employees, plant, equipment, product, location, and customers). A change of employees by itself is generally not enough of a change to be considered substantial within the meaning of I.R.C. § 382(a). *See Clarksdale Rubber Co. v. Commissioner*, 45 T.C. 234, 247 (1965). Furthermore, the change of employees in this case is even of less significant because H.P.I., the prior owner of Hermes, retained control over the day to day management of the Products Division's affairs.[31]

---

**30.** The change of employees is not as dramatic as defendant suggests. Only one key employee was changed and most of the other employees with Hermes before the recapitalization remained with the company afterwards. The biggest change of employees came by way of increase as a result of increased sales; and as just stated above, no substantial change can be deemed to have occurred simply because the company increased its business.

**31.** H.P.I.'s control over the day-to-day affairs of the Products Division was a condition of the

There is one other way in which a substantial change can be found to exist under I.R.C. § 382(a). This occurs when the prior line of business has become inactive by the time of the acquisition and is only revived afterwards. Treas.Reg. § 1.382(a)–1(h)(6) (1978); *see also Princeton Aviation Corp. v. Commissioner*, 47 T.C.M. at 586–87. According to the evidence presented, Hermes suffered a serious slowdown of its operations by the time of Hamilton's acquisition. Its distribution of office products had been reduced to one type of light office typewriter and to several models of calculators. Hermes only had twelve employees left and the bulk of their work was devoted toward servicing the warranties on old contracts. The company even terminated its pension and investment plan for employees.

Yet, while it can be said that Hermes was down, it can, by no means, be said that Hermes was out. Its sales may have been reduced to a third and its employees reduced to a fraction, but the company never terminated, *see* Treas.Reg. § 1.382(a)–1(h)(6) (example 1 & 2) (1978); *Glover Packing of Texas v. United States*, 164 Ct.Cl. 572, 581, 328 F.2d 342, 348 (1964); *see also United States v. Fenix & Scisson, Inc.*, 360 F.2d 260, 266 (10th Cir. 1966), *cert. denied*, 386 U.S. 1036, 87 S.Ct. 1474, 18 L.Ed.2d 599 (1967) (the corporation was inactive where its company had voted to liquidate, its business abandoned and only turned to the rental of property leaving a few employees), nor even suspended its operations. Treas.Reg. § 1.382(a)–1(h)(6) (example 2); *The Wallace Corp. v. Commissioner*, 23 T.C.M. (CCH) 89, 51 (1964). In fact, Hermes continued to produce a gross income of $100,000, an amount which can hardly be considered negligible in this case. Thus, Hermes' operations cannot be said to have become so inactive as to fall within the meaning of a substantial change under I.R.C. § 382(a).

### Conclusion

Upon review of all the evidence and arguments presented, the court finds that Hermes' 1978 carry-over deductions should not be disallowed on the basis of I.R.C.

operating agreement between Hamilton and

§ 269 or I.R.C. § 382. I.R.C. § 269 cannot be applied here because there was no 50% acquisition in Hermes' stock value or in Hermes' voting power. I.R.C. § 382 is inapplicable as well because there was no 50% point acquisition of Hermes' stock; and even if a 50% point acquisition did occur, Hermes did not undergo a substantial change of its trade or business.

The clerk is therefore directed to enter judgment in favor of plaintiff in the amount of $727,830 in principal, $311,730.59 in assessed interest, and for all of the accrued statutory interest thereon.

IT IS SO ORDERED.