T.C. Memo. 2013-270

UNITED STATES TAX COURT

GARY L. FISH AND ANN T. FISH, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3768-11.                    Filed November 25, 2013.

<u>Erik R. Edwards</u>, <u>Dennis Joseph Dobbels</u>, and <u>William J. Sanders</u>, for petitioners.

<u>Douglas S. Polsky</u> and <u>Charles J. Graves</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  In a notice of deficiency, respondent determined that petitioners' long-term capital gain received as a flow-through distribution from an

**[\*2]** S corporation was ordinary income under sections 1239 and 1245,[1] and as a result petitioners were liable for a Federal income tax deficiency of $1,788,370 for tax year 2005.

After concessions,[2] the only issue for decision is whether income received by petitioner husband's S corporation in a section 351 transaction with its subsidiary should be reclassified as ordinary income under section 1239. Section 1239 treats gain from the sale of depreciable property between related taxpayers as ordinary income rather than as capital gain. Thus, the resolution of the issue depends upon whether petitioner husband's S corporation and its subsidiary were related persons for purposes of section 1239.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts, the exhibits attached thereto, and the exhibits introduced at trial are incorporated herein by this reference. Petitioners resided in Missouri when their petition was filed.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 (Code), as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Petitioners have conceded that $175,570 of boot should be characterized as ordinary income under sec. 1245 instead of capital gain.

**[*3]** I.  <u>FishNet Security, Inc. (Formerly, FishNet Consulting, Inc.)</u>

In 1996 Mr. Fish left his job as a systems architect to start a technology company that operated as a single-member limited liability company in the basement of his home.  Mr. Fish had no employees and, except for some personal savings, no capital.  He had, however, one signed consulting agreement, and toward the end of 1996 he sold his first firewall system.

In 1997 Mr. Fish started to transition into the enterprise information security market, and after a few successful projects with large clients, his business grew quickly.  By 1998 Mr. Fish's business had eight employees, an office in downtown Kansas City, and a training center.  On February 2, 1998, Mr. Fish incorporated his business as FishNet Consulting, Inc. (FishNet Consulting), d.b.a. FishNet Security, with the Missouri secretary of state.  FishNet Consulting elected to be treated as a subchapter S corporation.

By 2004 FishNet Consulting described itself as the largest privately held network security solutions company in North America.  It had over 70 employees and offices in six major cities throughout the Midwest, while considering expanding into several additional markets.  Over three years, from 2001 to 2003, FishNet Consulting's revenue increased 90.8% from $15.3 million to $29.2 million, respectively, and its adjusted earnings before interest, taxes, depreciation,

[*4] and amortization (EBITDA) grew 26.3% from $1.9 million to $2.4 million,
respectively. After its first quarter in 2004 FishNet Consulting had projected 2004
revenues of $40.9 million and estimated adjusted EBITDA of $3.8 million. Mr.
Fish decided that it was time to find additional capital for his rapidly growing
business.

In 2004 FishNet Consulting retained Greene Holcomb & Fisher LLC
(Greene Holcomb) as a financial adviser to evaluate potential financial partners
and possibly a sale of the company. Greene Holcomb helped FishNet Consulting
prepare and distribute a confidential offering memorandum. The result was one
offer from the private equity firm, the Edgewater Funds (Edgewater), to purchase a
minority interest in FishNet Consulting.

In a letter of intent dated September 17, 2004, Edgewater offered to
purchase newly created convertible series A preferred stock in FishNet
Consulting, to be renamed FishNet Security, Inc. (FishNet Security), representing
43% of the company's outstanding equity on a fully diluted basis for $12 million.[3]

---

[3]According to the terms of Exhibit A to the letter of intent, the fully diluted
shares after the initial sale of $10.5 million of preferred stock were: 51.3% of
common stock outstanding, 38.7% of preferred stock outstanding, and 10%
reserved for employee stock options. After the purchase of additional shares of
preferred stock for $1.5 million, the percentage of preferred stock outstanding
would increase to 43%.

**[*5]** Upon closing, the parties agreed that the sale proceeds would be distributed to Mr. Fish by redeeming a portion of his shares.

On November 3, 2004, Mr. Fish incorporated Fish Holdings, Inc. (Fish Holdings), with the secretary of state of Missouri and had it elect to be treated as a subchapter S corporation. In a section 368(a)(1)(F) tax-free reorganization, Mr. Fish contributed 100% of his FishNet Consulting common stock to Fish Holdings in a section 351 transaction. The next day, on November 4, 2004, Fish Holdings and FishNet Consulting executed a Form 8869, Qualified Subchapter S Subsidiary Election, to treat FishNet Consulting as a qualified subchapter S subsidiary (QSub) under section 1361(b)(3)(B). The QSub election was treated as a deemed tax-free liquidation of FishNet Consulting into Fish Holdings under section 332.

On December 10, 2004, FishNet Consulting, Mr. Fish as founder of FishNet Consulting, and the purchasers of the series A preferred stock, Edgewater Private Equity Fund IV, L.P., Edgewater Private Equity Fund III, L.P., and Topwater Investment Partners, L.P. (collectively, investors), signed the FishNet Consulting, Inc. Series A Preferred Stock Purchase Agreement. The investors agreed to purchase, and FishNet Consulting agreed to sell, $10.5 million of newly created series A preferred stock on January 3, 2005, plus an additional $1.5 million of series A preferred stock in subsequent closings within three years. The baseline

[*6] valuation of FishNet Consulting was $27,900,600, which was to be adjusted after the company's 2004 audited financial statements were prepared, and the initial closing price per share of preferred stock was $1.24031.

On January 3, 2005, FishNet Consulting filed an amendment to its articles of incorporation that was effective as of that date. Among other things, FishNet Consulting changed its name to FishNet Security, increased its board of directors from one to five members, and created a new class of stock, the series A preferred stock. FishNet Security was authorized to issue 26,209,375 shares of common stock and 9,675,000 shares of series A preferred stock. The creation of the series A preferred stock terminated FishNet Security's (formerly, FishNet Consulting) S corporation status and QSub election. See sec. 1361(b)(1)(D).

The series A preferred stock had preferential rights to cumulative dividends, which had to be paid either before or simultaneously with dividends on common stock or any other class of outstanding stock. The cumulative dividends accrued at a rate of 7% per annum and were payable when declared by the board, upon a liquidation event, or when the preferred stock is redeemed or voluntarily converted into common stock. Pursuant to the amended articles of incorporation, FishNet Security paid one-time dividends to its common stockholder, Fish Holdings, of: (1) $2.5 million on December 31, 2004; (2) $9,463,327, the sale

[*7] proceeds from the stock purchase agreement, on January 3, 2005; and (3) a loan to Mr. Fish with a principal amount of $413,244.61. FishNet Security also transferred to Fish Holdings all membership interests of Secure Passage, LLC, a former subsidiary, with assets of $286,486 on November 5, 2004. In addition, a promissory note from Mr. Fish to his former wife dated January 1, 2003, and guaranteed by FishNet Consulting was outstanding as of January 3, 2005.

The series A preferred stock also had rights to preferential liquidation payments, redemption payments, and conversion into common stock. The liquidation payments, which were triggered upon a deemed liquidation event, were equal to the original purchase price of $1.24031 per share, plus all accrued and unpaid dividends and a ratable share, on a one-to-one convertible basis, of assets and property distributed to the common stock.[4] The redemption payments, which were to be received at the option of the majority of outstanding shares of series A

---

[4]A deemed liquidation event included the following, provided that immediately after the event FishNet Security's stockholders did not hold a majority of the outstanding voting power: (1) a merger or consolidation of FishNet Security; (2) the sale or transfer of all or substantially all of FishNet Security's assets; (3) the purchase of FishNet Security's capital stock by a party or group that did not beneficially own a majority of the voting power of the outstanding shares of capital stock; or (4) an underwritten public offering of FishNet Security's common stock. If the aggregate proceeds from a deemed liquidation event were more than $65,625,000, then the series A preferred stockholders would receive a fraction of the issue price, which would be reduced to zero if the aggregate proceeds were equal to or greater than $83,125,000.

**[*8]** preferred stock beginning on or after January 3, 2009, or at the option of FishNet Security beginning on or after January 3, 2010, were equal to the greater of the original purchase price of $1.24031 per share, plus all accrued and unpaid dividends, or fair market value. The conversion rights included a mandatory conversion into shares of common stock upon the earlier of the closing of an initial public offering of shares of common stock at a price equal to at least three times the original purchase price per share of series A preferred stock resulting in at least $45 million of proceeds or upon the written consent of the majority of outstanding shares of series A preferred stock.

In addition, the series A preferred stock had voting rights, and as of January 3, 2005, each share of series A preferred stock was entitled to one vote per share.[5] Each share of common stock also had one vote per share, and except as otherwise provided by law or the amended articles of incorporation, the common stockholders and series A preferred stockholders voted as a single class. Any action by the FishNet Security stockholders required an affirmative vote of a majority of the outstanding shares of stock. The series A preferred stockholders,

---

[5]Holders of the series A preferred stock were entitled to the number of votes equal to the number of whole shares of common stock into which the series A preferred stock was convertible. The conversion was determined by dividing the series A preferred stock issue price by the conversion price. As of January 3, 2005, the conversion price was equal to the issue price of $1.24031 per share.

[*9] however, voted as a separate class to elect two out of the five authorized directors of FishNet Security. The common stockholders voted as a separate class to elect the remaining three directors one of whom had to be "independent" and approved by a majority of the series A preferred stockholders.[6] The series A preferred stockholders could not withhold their approval unreasonably. The directors, including the independent director, could be removed without cause only by the affirmative vote of the holders of the class of stockholders that elected them.

The board of directors exercised all corporate powers of FishNet Security, including controlling and managing its property and business, except as otherwise provided by law, the articles of incorporation, or bylaws. An action by the board required an affirmative vote of a majority of the directors present at a meeting. A majority of the full board constituted a quorum for a meeting.

After filing the amended articles of incorporation, the investors contributed $10.5 million in cash to FishNet Security in exchange for 8,465,625 shares of its newly authorized series A preferred stock. On the same day, January 3, 2005,

---

[6]The independent director could not be affiliated with FishNet Security and its stockholders. In addition the director had to be deemed "independent" pursuant to the rules and regulations of the Securities and Exchange Commission and the National Association of Securities Dealers.

[*10] FishNet Security declared and paid a dividend of $9,463,327 to Fish Holdings.  Fish Holdings was deemed to have contributed all of the assets and liabilities of FishNet Security, the QSub, to FishNet Security, the newly formed C corporation, in exchange for 14,034,375 shares of common stock and $9,463,327 cash.[7]  See sec. 1361(b)(3)(C)(ii)(II); see also infra p. 17.  The exchange qualified for tax-free treatment under section 351 with respect to the stock received by the parties, but the cash distribution to Fish Holdings was taxable boot equal to the lesser of the amount of boot received, $9,687,695,[8] or the amount of gain from the assets, $9,638,270.  See sec. 351(b).  As a result of the cash distribution to Fish Holdings, FishNet Security received a step-up in basis in its assets.  After the closing of the stock purchase agreement, Fish Holdings owned all of the issued and outstanding shares of FishNet Security's common stock and the investors

---

[7]FishNet Security's assets, which included its wholly owned subsidiary, FishNet Texas, Inc., had a basis of $10,366,018.  On Form 4562, Depreciation and Amortization, attached to its Form 1120, U.S. Corporation Income Tax Return, for tax year 2005, FishNet Security reported sec. 197 intangible assets with an amortizable amount of $9,462,700 as of January 1, 2005.  FishNet Security also reported sec. 167 depreciable assets with a total basis for depreciation of $715,355.  The amount of liabilities assumed by FishNet Security was $10,028,520.

[8]The total cash distributed to Fish Holdings in the sec. 351 transaction was $9,687,695, which included the dividend distribution of $9,463,327 on January 3, 2005, and an additional dividend distribution of $224,368 on December 31, 2005, as a valuation adjustment under the stock purchase agreement.

[*11] owned all of the issued and outstanding shares of FishNet Security's series A preferred stock.

FishNet Security[9] and its new stockholders, the investors and Mr. Fish, signed a shareholders agreement effective January 3, 2005. The shareholders agreement reiterated some of the terms in the amended articles of incorporation, such as the composition of the board of directors, and added additional terms to the arrangement between Fish Holdings and the investors. The parties agreed, for example, that the board of directors would have a compensation committee and an audit committee, each comprised of two members, Mr. Fish and a representative of the investors. In addition, all stockholders received rights of first refusal and tag-along rights, and the investors alone received information rights and registration rights in the event FishNet Security filed a registration statement registering its securities for a public offering.

The parties also agreed to impose restrictions on FishNet Security and its management, namely, Mr. Fish. The parties agreed that until the investors no longer owned shares of FishNet Security the company could not engage in certain

---

[9]In the recitals to the shareholders agreement, FishNet Security is referred to as the company, but on the signature page the company is defined as FishNet Consulting. The agreement was signed by Mr. Fish as president of FishNet Consulting.

**[*12]** actions without the prior written consent of a majority of the series A preferred stockholders. The actions, which were defined as negative covenants, included the following:

(1) amend, alter, or repeal any provision of the restated articles or the bylaws of the company;

(2) issue or agree to issue any dividends on capital stock other than dividends issued on (i) the common stock before the issuance of any preferred stock or (ii) the preferred stock;

(3) authorize, designate, or issue, whether by reclassification or otherwise, additional shares of preferred stock in addition to those shares of preferred stock contemplated to be issued under the purchase agreement or alter or change the rights, obligations, preferences, privileges or powers of, or the restrictions provided for the benefit of, the preferred stock;

(4) authorize, designate, or issue, whether by reclassification or otherwise, any class or series of stock or any other securities convertible into equity securities of the company ranking on a parity with or senior to the preferred stock in any respect, including, without limitation, rights of redemption, liquidation preference, voting rights or dividends;

**[\*13]**     (5) issue, or agree to issue, any shares of capital stock (or the capital stock of a subsidiary of the company), other than exempted issuances for consideration other than cash in connection with an acquisition by the company of another entity that is approved by a majority of the members of the board, which majority includes investors' representatives, at a price per share that is less than the series A per share issue price (as defined in the restated articles);

(6) subject to other restrictions, effect any deemed liquidation event[10] (as defined in the restated articles);

(7) acquire or dispose of, or agree to acquire or dispose of, a material number of assets used or to be used by the company;

(8) own or acquire, or attempt to own or acquire, any subsidiaries;

(9) make or attempt to make any material change to the business of the company, enter or attempt to enter into new lines of business, or exit or attempt to exit any of the company's current lines of business; or

(10) except with regard to Mr. Fish, hire or employ any person whose annual base compensation exceeds $150,000 or increase the annual base compensation of any employee of the company above $150,000. The parties also agreed that management, which included Mr. Fish as CEO and

---

[10]See supra note 4.

[*14] president of FishNet Security, could not sell their stock other than in connection with a deemed liquidation event and with the prior written approval of the investors.

## II. Reporting Positions

On Form 4562 attached to its Form 1120 for tax year 2005, FishNet Security reported section 197 intangibles with an amortizable amount of $9,462,700 as of January 1, 2005.[11] FishNet Security claimed an amortization deduction of $630,847 for 2005, which was reported above the line on the front page of its return as part of "Other deductions". FishNet Security also reported section 167 depreciable assets with a total basis for depreciation of $715,355 and claimed a depreciation deduction of $222,447. Like the amortization deduction, the depreciation deduction was also reported above the line on the front page of FishNet Security's corporate return. According to the notes to the 2005 and 2006

---

[11]The parties do not dispute that FishNet Security, the C corporation, acquired sec. 197 intangibles that were amortizable in FishNet Security's hands as a result of the stock purchase sale. Nonetheless, the parties do not identify, and the record does not describe, the amortizable sec. 197 intangibles reported on FishNet Security's corporate return for 2005. The Court understands the amortizable sec. 197 intangibles to be primarily, if not entirely, goodwill under sec. 197(d)(1)(A).

[*15] consolidated financial statements for FishNet Security Holdings, Inc.,[12] FishNet Security took a step-up in basis in its assets. The step-up in basis was treated as an intangible asset for tax purposes in the amount of $9,400,000 and amortizable over a period of 15 years.

On its Form 1120S, U.S. Income Tax Return for an S Corporation, for tax year 2005, Fish Holdings reported $9,687,699[13] of dividend distributions from FishNet Security. Fish Holdings reported the dividend distributions as long-term capital gain, which was allocated as flow-through income to Mr. Fish, Fish Holdings' sole stockholder, and reported on petitioners' joint tax return for 2005.

On November 22, 2010, respondent issued to petitioners a notice of deficiency determining an income tax deficiency of $1,788,370 for tax year 2005. In the notice, respondent determined that petitioners' reported long-term capital

---

[12]In March 2006, after the tax year in issue, FishNet Security reorganized, whereupon a new holding company, FishNet Security Holdings, Inc. (FishNet Security Holdings), owned all of the outstanding shares of FishNet Security. The equity structure of FishNet Security Holdings mirrored the equity structure of FishNet Security.

[13]Fish Holdings and petitioners reported the amount of the dividend distributions as $9,687,699, instead of $9,687,695, on their respective tax returns for 2005. According to respondent the $4 increase has no tax consequence.

[*16] gain from Fish Holdings was ordinary income under sections 1239 and 1245. Petitioners timely filed a petition with the Court seeking redetermination.[14]

OPINION

I. Fish Holdings and FishNet Security

In November 2004, before closing on the stock purchase agreement, Mr. Fish incorporated Fish Holdings and had it elect to be treated as a S corporation. Mr. Fish transferred to Fish Holdings his entire interest in FishNet Consulting and made a QSub election for FishNet Consulting under section 1361(b)(3)(B). As a result of the QSub election, FishNet Consulting was treated as liquidating into Fish Holdings, and the tax consequences of the liquidation are determined in part under section 332.[15] See sec. 1.1361-4(a)(2), Income Tax Regs. After the QSub

---

[14]Before filing a petition, petitioners conceded that boot of $175,570 was properly recharacterized as ordinary income pursuant to sec. 1245 instead of as long-term capital gain.

[15]Under sec. 197(f)(2), if a sec. 197 intangible is acquired in a sec. 332 transaction, inter alia, the transferee generally steps into the shoes of the transferor with respect to the amount of adjusted basis of the intangible in the hands of the transferee that does not exceed the adjusted basis in the hands of the transferor. If a sec. 197 intangible was not amortizable in the hands of the transferor, the transferee's adjusted basis, to the extent it does not exceed the transferor's adjusted basis, cannot be amortized under sec. 197. Sec. 1.197-2(g)(2)(ii)(B), Income Tax Regs. Therefore, any self-created goodwill, which is not an amortizable sec. 197 intangible, see sec. 1.197-2(d)(2), Income Tax Regs., transferred from FishNet Consulting to Fish Holdings in the deemed sec. 332

(continued...)

[*17] election, FishNet Consulting was disregarded as a separate corporation for Federal income tax purposes and its assets and liabilities were treated as being owned by Fish Holdings. See sec. 1361(b)(3)(A).

After FishNet Security (formerly, FishNet Consulting) issued the series A preferred stock to the investors, it was no longer solely owned by Fish Holdings, a S corporation, and its QSub status was terminated. See sec. 1361(b)(3)(B) and (C). Under section 1361(b)(3)(C)(ii), FishNet Security was treated as a new corporation acquiring all of its assets and assuming all of its liabilities from Fish Holdings, its S corporation parent, immediately before its QSub status was terminated in exchange for stock. See sec. 1.1361-5(b), Income Tax Regs. The exchange is treated as if the investors and Fish Holdings made concurrent contributions to FishNet Security in a section 351 transaction. See sec. 1361(b)(3)(C)(ii)(II).

Under section 351 "No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation." Section 351(b),

---

[15](...continued)
liquidation was not amortizable under sec. 197.

[*18] however, provides that if other property or money, also known as boot, is received by a transferor in an otherwise tax-free section 351 transaction, the transferor must recognize gain to the extent of the boot received. Therefore, under section 351(b), the dividend distribution issued to Fish Holdings was taxable boot.

The parties do not dispute that the dividend distribution to Fish Holdings was taxable. Rather, they dispute whether the distribution was taxable as long-term capital gain, as reported by petitioners, or as ordinary income under section 1239.

II. Section 1239 Sales of Depreciable Property Between Related Taxpayers

A. Section 1239, Generally

Section 1239 requires ordinary income treatment of the gain recognized from the sale or exchange of property, directly or indirectly, between related persons, if the property in the hands of the transferee is "of a character which is subject to the allowance for depreciation provided in section 167." According to the House report on the Revenue Act of 1951, Pub. L. No. 82-183, sec. 328(a), 65 Stat. at 452, which created the predecessor to section 1239,[16] the policy behind that section was to prevent taxpayers from selling depreciable assets to a related

_____

[16]The section was carried forward unchanged as sec. 1239 of the Code of 1954. See H.R. Rept. No. 83-1337, at A286 (1954), 1954 U.S. C. C. A. N. 4017, 4428; S. Rept. No. 83-1622, at 444 (1954), 1954 U.S. C. C. A. N. 4621, 5087.

[*19] entity and, for the price of capital gain, receiving a step-up in basis such that the assets can be depreciated again.  See H.R. Rept. No. 82-586, at 26 (1951), 1951-2 C.B. 357, 376 ("[T]his bill eliminates the tax advantage from such transactions by denying capital-gains treatment to the transferor with respect to sales or exchanges of depreciable property[.]"); see also Lan Jen Chu v. Commissioner, 486 F.2d 696, 700-701 (1st Cir. 1973), aff'g 58 T.C. 598 (1972).

For purposes of chapter 1 of subtitle A of the Code, which includes section 1239, an amortizable section 197 intangible is treated as property of a character subject to the allowance for depreciation under section 167.  Sec. 197(f)(7); see also sec. 1.197-2(g)(8), Income Tax Regs.  Moreover, section 1.197-2(g)(8), Income Tax Regs., provides that "an amortizable section 197 intangible is section 1245 property and section 1239 applies to any gain recognized upon its sale or exchange between related persons (as defined in section 1239(b))." See also  H.R. Rept. No. 103-213, at 688 (1993), 1993-3 C.B. 393, 566.  Thus, the gain from the sale or exchange of property between related taxpayers is subject to the antiabuse provisions of section 1239 if the property is an amortizable section 197 intangible in the hands of the transferee.

**[*20]** B. <u>Amortizable Section 197 Intangibles</u>

An amortizable section 197 intangible is any section 197 intangible acquired after August 10, 1993, and held in connection with the conduct of a trade or business or an activity described in section 212. Sec. 1.197-2(d)(1), Income Tax Regs. Section 197 intangibles include, inter alia, goodwill. Sec. 197(d)(1)(A). On January 3, 2005, FishNet Security acquired section 197 intangibles, i.e., goodwill, from Fish Holdings in a section 351 transaction.[17] As a result, the section 197 intangibles became amortizable in the hands of FishNet Security, the transferee.

On its corporate return for 2005, FishNet Security reported its acquisition of: (1) section 197 intangibles with an amortizable basis of $9,462,700 as of

---

[17]Although self-created goodwill is not amortizable, sec. 1.197-2(d)(2), Income Tax Regs., any self-created goodwill held by Fish Holdings became an amortizable sec. 197 intangible for FishNet Security as a result of the deemed sec. 351 transaction in January 2005. Generally, sec. 197 intangibles acquired in a sec. 351 transaction are not amortizable to the extent of the transferor's adjusted basis if they were not amortizable in the transferor's hands. Sec. 1.197-2(g)(2)(ii)(B), Income Tax Regs. However, any increase in the transferee's adjusted basis as the result of recognized gain is amortizable under sec. 197. <u>Id.</u> Fish Holdings received a dividend distribution in the deemed sec. 351 transaction with FishNet Security. Fish Holdings recognized gain in the amount of the dividend distribution, which was $9,462,700, and FishNet Security received a corresponding step-up in basis. Thus, the amortizable amount for the sec. 197 intangibles transferred to FishNet Security was $9,462,700, <u>see</u> sec. 1.197-2(g)(2)(ii)(B), Income Tax Regs., and was reported as such on FishNet Security's corporate return for 2005.

[*21] January 1, 2005, the first month in which the amortizable section 197 intangibles were acquired, see sec. 197(a); and (2) section 167 depreciable assets with a total basis for depreciation of $715,355.[18] Fish Holdings recognized gain of $9,462,700, the dividend distribution, from the transaction. Therefore, if Fish Holdings and FishNet Security were related persons under section 1239(b), the dividend distribution to Fish Holdings, reported by petitioners, was taxable as ordinary income.

### C. "Related Persons" for Purposes of Section 1239

Section 1239(b)(1) defines "related persons" as "a person and all entities which are controlled entities with respect to such person". Section 1239(c)(1) defines "controlled entity" as "(A) a corporation more than 50 percent of the value of the outstanding stock of which is owned (directly or indirectly) by or for such person" and "(C) any entity which is a related person to such person under paragraph (3), (10), (11), or (12) of section 267(b)." Because FishNet Security was no longer a S corporation after the stock purchase agreement closed on January 3, 2005, only section 267(b)(3) and (12) is applicable.

---

[18]On its corporate return for 2005 FishNet Security also claimed an amortization deduction of $630,847 and a depreciation deduction of $222,447, thereby reducing its total income by $853,294 in 2005.

[*22] Related taxpayers under section 267(b)(3) and (12) include: (1) two corporations which are members of the same controlled group as defined in section 267(f), see sec. 267(b)(3); and (2) a S corporation and a C corporation, if the same persons own more than 50% in value of the outstanding stock of each corporation, see sec. 267(b)(12). A "controlled group" for purposes of section 267(b)(3) is defined in section 267(f) as having the same meaning as provided by section 1563(a), except that "more than 50 percent" is substituted for "at least 80 percent" and the determination is made without regard to section 1563(a)(4) and (e)(3)(C).

Under section 1563(a)(1), as modified by section 267(f), a controlled group means one or more chains of corporations connected through stock ownership with a common parent corporation if (A) stock possessing more than 50% of the total combined voting power of all classes of stock entitled to vote or more than 50% of the total value of shares of all classes of stock of each of the corporations, except the common parent corporation, is owned by one or more of the other corporations; and (B) the common parent corporation owns stock possessing more than 50% of the total combined voting power of all classes of stock entitled to vote or more than 50% of the total value of shares of all classes of stock of at least

[*23] one of the other corporations excluding, in computing such voting power or value, stock owned directly by such other corporations.[19]

Accordingly, in order to apply section 1239 to the distribution of sale proceeds from FishNet Security to Fish Holdings, the Court must determine whether Fish Holdings and FishNet Security were related persons for purposes of section 1239. Specifically, the Court must determine whether Fish Holdings owned either more than 50% of the total combined voting power of all classes of FishNet Security's stock entitled to vote or more than 50% of the total value of shares of all classes of FishNet Security's stock.

## III. Voting Power

After the stock purchase agreement closed on January 3, 2005, Fish Holdings owned 14,034,375 shares of FishNet Security's common stock, or about two-thirds of the issued and outstanding shares of stock entitled to vote, and the

[19]Sec. 1.1563-1(a)(6), Income Tax Regs., provides that in determining whether the stock owned by a person (or persons) possesses a certain percentage of the total combined voting power of all classes of stock entitled to vote of a corporation, consideration will be given to all the facts and circumstances of each case. The regulation, however, is effective for taxable years beginning on or after May 26, 2009, and the temporary regulation before it, sec. 1.1563-1T(a)(6), Temporary Income Tax Regs., 74 Fed. Reg. 25153 (May 27, 2009), which mirrors the language of the final regulation, was effective for taxable years beginning on or after December 22, 2006. The transaction at issue, however, occurred on January 3, 2005, and therefore neither the final nor the temporary regulation applies.

[*24] investors collectively owned 8,465,625 shares of FishNet Security's series A preferred stock, or one-third of the issued and outstanding shares of stock entitled to vote. As of January 3, 2005, each share of common stock and preferred stock was entitled to one vote. Therefore, on the sole basis of record ownership, Fish Holdings owned more than 50% of FishNet Security's voting stock.

In Hermes Consol., Inc. v. United States, 14 Cl. Ct. 398, 405 (1988), the court considered whether the taxpayer's common stockholder satisfied the 50% voting power standard of section 269.[20] The common stockholder owned 100,000 shares of common stock of the taxpayer and the preferred stockholder owned 104,000 shares of preferred stock. Id. Since both classes of stock were entitled to one vote per share, the common stockholder owned less than 50% of the taxpayer's voting stock. Id.

Although the percentage of voting stock owned is generally the critical factor for determining a stockholder's voting power, the court held that "record ownership is not the sole criteria for determining voting power where there is other evidence to the contrary." Id. (citing Jupiter Corp. v. United States, 2 Cl. Ct.

---

[20]For purposes of sec. 269, acquisitions made to evade or avoid income tax, "control" means "the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation."

**[*25]** 58, 64-65 (1983), and <u>Ach v. Commissioner</u>, 358 F.2d 342, 346 (6th Cir. 1966)). The court found that voting power also includes the "ability to approve or disapprove of fundamental changes in the corporate structure, and the ability to elect the corporation's board of directors." <u>Id.</u>

The common stockholder, despite owning less than 50% of the taxpayer's voting power, had the same ability to approve or disapprove of fundamental corporate changes as the preferred stockholder. <u>Id.</u> A majority of the common stock and a majority of the preferred stock had to approve an amendment to the taxpayer's certificate of incorporation, change its capital stock, file for bankruptcy, or make a general assignment for the benefit of creditors. <u>Id.</u> Moreover, in order to dissolve, merge, consolidate, or reorganize, two-thirds of the common stock and two-thirds of the preferred stock had to approve. <u>Id.</u> Therefore, the court held that with respect to its ability to implement fundamental changes in the taxpayer's corporate structure the common stockholder had 50% voting power. <u>Id.</u>

With respect to the election of directors, however, the court found that the common stockholder did not have 50% voting power. <u>Id.</u> at 405-406. The common stockholder and the preferred stockholder were each entitled to elect one

[*26] of the three directors to the board. Id. at 405. The third director[21] was elected by the majority of all the shares voting as a single class. Id. Because the preferred stockholder owned more shares, and therefore more votes, than the common stockholder, the preferred stockholder had the power to elect the third director without the consent of the common stockholder. Hermes Consol., Inc., 14 Cl. Ct. at 405-406. Accordingly, the court held that the common stockholder had less than 50% of the voting power to elect members to the board of directors, and this was sufficient to keep its overall voting power below 50%. Id. at 406.

Relying in part on Hermes Consol., petitioners argue that even though on the basis of record ownership Fish Holdings owned more than 50% of FishNet Security's voting stock, Fish Holdings' voting power was less than 50%. Similar to the approval required for the fundamental corporate changes described in Hermes Consol., FishNet Security could not engage in certain actions without the approval of Fish Holdings, which owns more than 50% of all shares entitled to vote, and the prior written consent of a majority of the series A preferred

---

[21]Although not required to be independent, the court found that the third director was independent. Hermes Consol., Inc. v. United States, 14 Cl. Ct. 398, 406 (1988).

[*27] stockholders.[22]  Therefore, with respect to fundamental corporate changes, petitioners argue that Fish Holdings owns a 50% voting power, which is less than the "more than 50%" voting power threshold required by section 1563(a)(1), as modified by section 267(f).

Likewise, petitioners argue that Fish Holdings' voting power is less than 50% with respect to its ability to elect FishNet Security's board of directors.[23] According to FishNet Security's amended articles of incorporation, the common stockholder elects two out of the five directors and the preferred stockholders elect another two.  The common stockholder also elects the fifth director, who must be "independent," as defined in the amended articles of incorporation, and must be approved by the preferred stockholders.  The preferred stockholders cannot unreasonably withhold their approval.  Although Fish Holdings, the common

[22]The fundamental corporate changes described in Hermes Consol., which included amendments to the taxpayer's certificate of incorporation, changes in its capital stock, bankruptcy, dissolution, mergers, consolidations, and reorganizations, are substantially similar to the restrictions imposed on FishNet Security, which also include amendments to FishNet Security's articles of incorporation, changes to its capital stock, mergers, consolidations, and reorganizations.  See supra pp. 12-14.

[23]According to its bylaws, the board of directors of FishNet Security exercises all corporate powers, including the management and control of the company's property and business.  Each director has one vote and any action by the board requires a majority vote.

**[*28]** stockholder, may elect three out of five board members, or 60% of the board, petitioners contend that the independence requirement for the fifth director, in addition to the necessary approval by the preferred stockholders, reduces Fish Holdings' voting power to less than 50%.[24]

Although Fish Holdings may have a 50% voting power with respect to fundamental corporate changes in FishNet Security,[25] Fish Holdings may elect three out of five board members, or 60%, of the FishNet Security board. The limitations on Fish Holdings' ability to elect the fifth director are not the type that would reduce its voting power to below 50%. The independence requirement, for example, does not prevent Fish Holdings from exercising its voting power to elect the fifth director but merely reduces the pool of potential candidates. The limitation is far from overly restrictive, leaving Fish Holdings with a significant

---

[24]Although Fish Holdings named only two out of its three directors on January 3, 2005, it is the stockholder's legal right to exercise voting power that is determinative, as opposed to the actual exercise of voting power. See Alumax, Inc. v. Commissioner, 109 T.C. 133, 181 (1997), aff'd, 165 F.3d 822 (11th Cir. 1999); see also Hermes Consol., 14 Cl. Ct. at 405.

[25]The Court discusses the impact of the negative covenants on Fish Holdings' voting power beginning infra p. 32.

**[\*29]** number of potential candidates, and is in fact reasonable if, as the stock purchase documents seem to portray, the company wishes to become publicly owned.[26]

Moreover, the independence limitation does not diminish or nullify Fish Holdings' voting power, as petitioners propose on the basis of a similar argument in Hermes Consol. In Hermes Consol., 14 Cl. Ct. at 406, the court considered the Government's argument that the common stockholder had voting power of 50% because the independence of the third director nullified the preferred stockholder's voting power for that director, thereby leaving the common stockholder and the preferred stockholder with one director each. In rejecting the Government's position, the court assumed that the Government's premise was true, that the preferred stockholder's "use of its voting power to elect an independent board member could be considered as a nullification of that power". Id. Relying on the definition of "independent", which means being subject to control by none, the

---

[26]The Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, sec. 301, 116 Stat. at 775, which added sec. 10A(m) to the Securities and Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 881, required the national securities exchanges and national securities associations to prohibit the listing of any security of an issuer that is not in compliance with the audit committee requirements. Each member of the audit committee must be a member of the board of directors of the issuer and must otherwise be independent. Accordingly, if Mr. Fish and the investors intended to list the capital stock of FishNet Security on a national securities exchange, then the board of directors must have independent directors.

**[*30]** court found that the common stockholder still had control of only one out of three of the directors, or 33.3%. Id.

The court's conclusion on this point, however, does not apply here. First, the issue before the court was the common stockholder's voting power. The court did not have to determine the preferred stockholder's voting power and the impact, if any, its vote for the independent director had on its voting power. Thus, any discussion of the nullification of the preferred stockholder's vote for the independent director was assumed only for purposes of rejecting the Government's argument that the common stockholder had a 50% voting power.

In addition, the circumstances in which Fish Holdings might vote for the third and independent director differ from those of the preferred stockholder in Hermes Consol. In Hermes Consol., the preferred and common stockholders voted as a single class, on the basis of one vote per share, for the taxpayer's third and independent director. The preferred stockholder, however, owned more shares than the common stockholder and therefore controlled the appointment of the third director. In contrast, Fish Holdings is the only stockholder entitled to elect the independent director, and therefore any power to elect the independent director must be attributed solely to it. Accordingly, the requirement for an

[*31] independent director does not diminish Fish Holdings' voting power for that director.[27]

Likewise, the requirement that the investors approve of the independent director did not reduce Fish Holdings' voting power for that director. In Framatome Connectors USA, Inc. v. Commissioner, 118 T.C. 32 (2002), aff'd, 108 Fed. Appx. 683 (2d Cir. 2004), for example, the Court considered whether Burndy-US owned more than 50% of the total combined voting power of its foreign affiliate, Burndy-Japan, in order to determine whether Burndy-Japan was a controlled foreign corporation. The taxpayers argued that Burndy-US controlled Burndy-Japan because, inter alia: (1) it had, and exercised, the right to control, choose, and replace Burndy-Japan's presidents and board of directors, and (2) Burndy-US had the right to name five out of the nine Burndy-Japan directors. Id.

---

[27]Even if the nullification argument applied on these facts, it would fail nonetheless. There are several provisions in the Code that test control using vote and value thresholds of 50% or 80%. See, e.g., secs. 957(a), 1504(a). If a stockholder's election of an independent director was not attributed to its voting power, then corporations could structure their boards so that the voting thresholds would never be reached, as in the proposed scenario in Hermes Consol., and the parties would have to rely solely on the value test. Thus, the voting power test could be easily manipulated and rendered unnecessary. In addition, the requirement for an independent director is ubiquitous. All stock exchanges require independent directors as members of the board and the audit committee. Therefore, all publicly traded companies would be subject to control tests that discounted votes for independent directors, thereby distorting voting power percentages.

**[\*32]** at 52. The Burndy-Japan stockholders were authorized to nominate board members in proportion to their ownership interests, and Burndy-US, specifically, could nominate four directors and the president. Id. Under Japanese corporate law, the president must be a director. Id. The Burndy-Japan articles of incorporation, however, required an 80% majority of stockholders to approve the election of the director and the president. Id. Thus, the Japanese corporations could block the election for anyone Burndy-US nominated to serve as a director or president, and as a result, Burndy-US did not have voting power of more than 50%. Id.

Like Burndy-US in Framatome, Fish Holdings can nominate a majority of the directors on the board of FishNet Security. However, Fish Holdings' voting power has more weight than that of Burndy-US because it can actually elect the three directors it designates, including the tie-breaking third director. Although the investors must approve the independent director, the investors are not entitled to vote for the independent director. In Framatome, on the other hand, not only were the Japanese corporations authorized to vote for the tie-breaking director, but their affirmative votes were necessary to meet the supermajority requirement for the director's election. Moreover, the investors' consent on the independent director cannot be unreasonably withheld. In contrast, the Japanese corporations

**[*33]** in <u>Framatome</u> could block the election of the tie-breaking director for any reason. Therefore, Fish Holdings is attributed the voting power for the fifth and independent director it is entitled to elect, and as a result, Fish Holdings has a voting power threshold of three out of five directors, or 60%.

Petitioners argue that even if the Court finds that Fish Holdings can elect three out of the five directors, the negative covenants reduce its overall voting power below 50%.[28] In <u>Alumax, Inc. v. Commissioner</u>, 109 T.C. 133 (1997), <u>aff'd</u>, 165 F.3d 822 (11th Cir. 1999), the Court examined whether stock voting requirements and other restrictions placed on the board reduced the stockholders' voting power. The issue for decision in <u>Alumax</u> was whether Amax possessed at least 80% of the voting power of the taxpayer, an aluminum company with a net worth of over $700 million and total assets of $1.7 billion, for purposes of filing a consolidated return. <u>Id.</u> at 141, 162-163. After describing Amax's control of 8 out of 10 director votes, <u>id.</u> at 164 ,[29] with voting power of at least 80%, the Court

---

[28]The negative covenants are substantially similar to the fundamental corporate changes discussed in <u>Hermes Consol</u>. <u>See</u> <u>supra</u> note 22.

[29]Amax owned one class of stock, class C stock, and could elect four directors that had two votes each for a total of eight votes. <u>Alumax, Inc. v. Commissioner</u>, 109 T.C. at 164. The Japanese stockholders owned a different class of stock, class B stock, and could elect two directors that had one vote each for the remaining two votes. <u>Id.</u>

[*34] continued its analysis with an examination of "the impact, if any, of the respective director and stockholder class voting requirements, the mandatory dividend provision, and the objectionable action provision on the power of the Alumax class C common stock to participate in the management of Alumax, directly and/or indirectly through the class C directors whom that stock elected, and, therefore, on the voting power of that stock", id. at 171.  It was important to the Court's analysis that the taxpayer was arguing that Amax had only 80% of the voting power, but not more.  Id. at 163.  The Court therefore did not have to determine the exact percentage of Amax's voting power, but only whether it was at least 80%.

The class voting requirements required an affirmative vote of a majority of the class B directors and the class C directors, voting by class and not in the aggregate, on the following matters:  (1) a merger; (2) purchase or sale of any asset worth at least 5% of Alumax's net worth; (3) the expenditure of capital or disposition of assets worth more than $30 million; and (4) the election or dismissal of Alumax's chief executive officer.[30]  Alumax, Inc. v. Commissioner, 109 T.C. at

---

[30]The voting restrictions were also imposed on a partial or complete liquidation or dissolution of Alumax and loans to affiliated corporations not in the ordinary course of business, but the parties did not address these restrictions, and the Court limited its holding accordingly.  Alumax, Inc. v. Commissioner, 109

(continued...)

**[*35]** 141, 144. The same restrictions were imposed on the stockholders and required an affirmative vote of a majority of outstanding shares of each class of stock, voting by class and not in the aggregate. Id. at 140-141.

The Court found that under applicable State law these restrictions were board management matters, as opposed to stockholder matters, that did not require the vote or approval of the stockholders, notwithstanding that stockholder approval was authorized by the corporate charter. Id. at 181. In making this distinction, the Court dismissed the taxpayer's argument that the director and stockholder voting requirements should be ignored when determining voting power because they were unusual and extraordinary, and not representative of the day-to-day, routine management matters. Id. The Court found to the contrary. According to the Court, the unusual nature of the restrictions emphasized that they were indeed important board management matters. Id.

For example, the Court found that the board's election or dismissal of the CEO/president was significant because the CEO/president had broad discretion over, and a significant role in, the management of the business and affairs of the taxpayer. Id. at 182-183. The Court also determined that the mandatory dividend

---

[30](...continued)
T.C. at 178.

**[*36]** provision and the objectionable action provision were significant because, with respect to the former, it obligated the board to declare and pay dividends, thereby restricting its power to declare and issue dividends; and with respect to the latter, it prevented the board from taking any action that could have had a material and adverse impact on the value of the class B common stock. Id. at 183-191. Accordingly, the Court held that Amax's overall voting power was below 80%. Id. at 191.

The Court in Framatome Connectors USA, Inc. v. Commissioner, 118 T.C. at 45, also considered voting requirements in its determination of the voting power of Burndy-US in Burndy-Japan. Burndy-US manufactured electrical and electronic connectors with sales of $300 to $350 million per year, and with two Japanese corporations, which were among the largest cable manufacturers in Japan with annual sales of $5 to $8 billion, formed Burndy-Japan to manufacture and sell Burndy-US products in Japan. Id. at 36. Burndy-US owned 50% of the stock of Burndy-Japan, and two Japanese corporations owned the remaining 50%. Id. at 41, 45. Burndy-Japan's articles of incorporation, however, required the affirmative vote of more than 80% of the outstanding shares of stock to: (1) amend the articles of incorporation; (2) elect directors and auditors; (3) change capital; and more. Id. at 49. Moreover, under the shareholders agreement, the

[*37] stockholders each had the power to veto the following six decisions: (1) changes in capital; (2) changes in license agreements; (3) acquisition or sale of shares in other companies; (4) payment of dividends; (5) transfer of a major part of the business; and (6) entrusting management to a third party. Id. The Court found that the veto powers in addition to the supermajority voting requirements reduced Burndy-US' voting power below 50%. Id. at 51-52.

In a shareholders agreement, Fish Holdings and the investors also agreed to voting restrictions with respect to their FishNet Security stock. The parties agreed that until the investors no longer owned shares of FishNet Security, the company could not engage in certain actions without the prior written consent of a majority of the series A preferred stockholders.[31] With the exception of a few matters, the negative covenants are significant board management matters similar to those in Alumax and Framatome.[32] Accordingly, the investors effectively have veto powers over many FishNet Security management matters.

The difference between Fish Holdings and the stockholders in Alumax and Framatome, however, is that Fish Holdings has significantly more managerial

---

[31]See supra pp. 12-14.

[32]Mo. Ann. Stat. sec. 351.090 (West 2001 & Supp. 2013), for example, requires a stockholder vote to adopt an amendment to a corporation's articles of incorporation.

[*38] control of the company, irrespective of the negative covenants, by virtue of Mr. Fish's role in management. In <u>Alumax</u> and <u>Framatome</u>, the taxpayers were large corporations with domestic and international affiliates that also had a high net worth and significant assets. Although the stockholders in <u>Alumax</u> and <u>Framatome</u> had significant yet limited voting rights with respect to corporate management through the directors they might elect, they were far removed from the management and operations of their respective corporations.

In contrast Mr. Fish, Fish Holdings' sole stockholder, was essentially FishNet Security, and it was his expertise and management of the company that was being purchased. FishNet Security, formerly FishNet Consulting, is a technology company started by Mr. Fish in the basement of his home. Its value was derived primarily from Mr. Fish's expertise, contacts, and management of the company. Indeed, the basis of FishNet Security's valuation for purposes of the stock purchase agreement was the $9.4 million of goodwill identified as amortizable section 197 intangibles.

Furthermore, there was an expectation that Mr. Fish would continue to have primary control of the company's business and affairs. The management covenant, for example, prevented Mr. Fish, as CEO, president, and chairman of the board, from leaving the company and selling his stock except in a deemed

**[*39]** liquidation of the company. In addition, unlike the restrictions on the board's election or dismissal of the CEO/president in <u>Alumax</u>, Mr. Fish agreed to continue as CEO and president of FishNet Security according to the terms of the stock purchase agreement and as a condition of sale. As the Court found in <u>Alumax</u>, any restriction on the board's election or removal of the CEO/president is significant because the CEO/president has broad discretion over, and a significant role in, the management of the business and affairs of the corporation. Likewise, Mr. Fish's role as CEO and president of FishNet Security is significant, and under these specific circumstances, weighs in favor of, or at the very least maintains, Fish Holdings' voting power.[33]

Notwithstanding the foregoing, the Court recognizes the significant limitations the negative covenants impose on the ability of Fish Holdings to manage FishNet Security through its directors and through its sole stockholder. Importantly, the limitations affect board management matters, such as the declaration and issuance of stock, as opposed to routine or day-to-day matters,

---

[33]The mandatory dividend provision in <u>Alumax</u> is also distinguishable. The mandatory dividend provision obligated the board to declare and pay dividends to the extent of 35% of Alumax's net income to the extent permitted by law. <u>Alumax, Inc. v. Commissioner</u>, 109 T.C. at 174 n.17. Although FishNet Security must obtain the approval of the investors before issuing any dividends, other than the dividend distribution to Fish Holdings and dividends on the preferred stock, the board was not required to declare and pay dividends.

**[\*40]** which according to the Court in <u>Alumax</u> have less of an impact on a stockholder's voting power. Even so, Fish Holdings continues to possess the ability to elect three out of five directors, or 60%. In <u>Alumax</u> and <u>Framatome</u>, the Court found that the negative covenants merely reduced the voting power percentages of the stockholders at issue, which were sitting at their applicable voting power thresholds of 80% and 50%, respectively, but the Court did not say by how much. Likewise, the negative covenants merely reduced Fish Holdings' voting power, but because of its ability to elect three out of five directors, or 60%, its overall voting power with respect to FishNet Security did not fall to 50% or below as of January 3, 2005. Accordingly, Fish Holdings and FishNet Security are related persons for purposes of section 1239 and any gain derived from the stock purchase transaction is taxable to petitioners, on a flow-through basis from Fish Holdings as ordinary income.

IV. <u>Valuation</u>

As discussed above, there are two types of control within the meaning of section 1563(a)(1) as modified by section 267 that would cause Fish Holdings and FishNet Security to qualify as related persons for purposes of section 1239. Fish Holdings must have owned either: (1) more than 50% of the total combined voting power of all classes of FishNet Security's stock entitled to vote, or (2) more

[*41] than 50% of the total value of shares of all classes of FishNet Security's stock as of January 3, 2005. The Court found that Fish Holdings met the voting power test. However, even if Fish Holdings did not meet the voting power test, it still qualifies as a related person with FishNet Security because it met the valuation test.

Petitioners contend that the value of the FishNet Security common stock owned by Fish Holdings was less than 50% of the total value of the outstanding shares of common and preferred stock as of January 3, 2005. Petitioners rely on the opinions of Steven L. York, who is qualified as an expert on valuing closely held businesses and in connection with this case prepared a report on the valuation of the common and preferred stock of FishNet Security as of January 3, 2005. In contrast, respondent argues that the value of the FishNet Security common stock owned by Fish Holdings was more than 50% of the total value of the outstanding shares of common and preferred stock as of January 3, 2005. Respondent relies on the opinions of Nancy J. Matheny, a qualified expert in stock and business valuation, as presented at trial and in her report on the valuation of the common and preferred stock of FishNet Security as of January 3, 2005.

The value of property for Federal tax purposes is a question of fact, see, e.g., Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), aff'g T.C. Memo.

**[\*42]** 1961-347; see also Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990), and petitioners bear the burden of proof, see Rule 142(a). Fair market value is the price that a hypothetical willing buyer would pay a hypothetical willing seller, both having reasonable knowledge of all relevant facts and neither being under a compulsion to buy or to sell. United States v. Cartwright, 411 U.S. 546, 551 (1973); see also Hermes Consol., 14 Cl. Ct. at 407. The fair market value of stock of a closely held corporation is "best ascertained" through arm's-length sales or transfers near the valuation date of reasonable amounts of that stock, as long as both buyers and sellers were willing and informed and the sales did not include a compulsion to buy or to sell. Polack v. Commissioner, 366 F.3d 608, 611 (8th Cir. 2004), aff'g T.C. Memo. 2002-145. If the value cannot be determined using relevant arm's-length sales, fair market value is generally determined using three approaches--market, income, and asset based. Estate of Noble v. Commissioner, T.C. Memo. 2005-2.

The experts for petitioners and respondent used the series A preferred stock purchase price of $1.24031, which was the value given to the stock in an arm's-length sale, and the market and income approaches. The experts determined that the total fair market value of FishNet Security as of January 3, 2005, ranges from $24.5 million, as determined by petitioners' expert, to $32 million, as determined

**[*43]** by respondent's expert. Petitioners' expert, however, found that the value of the FishNet Security common stock held by Fish Holdings was $9,073,400 and the value of the preferred stock held by the investors was $15,426,600, whereas respondent's expert found that the value of the common stock was $14,520,000 and the preferred stock was $11,260,201.[34]

The most significant difference between the two valuations is whether to account for the liquidation preference in calculating the value of the preferred stock. Petitioners' expert determined the value of the preferred stock of FishNet Security by assuming that the company liquidated immediately after it closed on the stock purchase agreement on January 3, 2005. In support of his valuation method, Mr. York explained: "You can't say a pool of money is available unless it's available to the common shareholders. There are many, many demands on that money in a liquidation, whether it be change in ownership or closing the company, before the common shareholders get any."

---

[34]One reason for the difference in valuation is the type of engagement employed by each expert. Petitioners' expert performed a calculation engagement, which is focused on a specific piece of the valuation, in this case the preferred stock. Respondent's expert, on the other hand, performed a valuation engagement, which is a full report on the value of the company. Both types of engagement, however, are recognized in the industry and accepted as estimates of value for closely held businesses.

[*44] According to the stock purchase agreement documents, the holders of the series A preferred stock were entitled to a refund of their purchase price of $10.5 million upon a deemed liquidation event if the aggregate proceeds from the liquidation did not reach a preference cap minimum of $65,625,000. Assuming liquidation proceeds equal petitioners' valuation of $24.5 million, the series A preferred stockholders would first receive $10.5 million plus any accrued but unpaid dividends before receiving their proportionate share of the remaining proceeds. Their proportionate share, if converted into common stock, would equal 35.19% of the total outstanding shares of stock. Thus, according to Mr. York, the total value of the preferred stock as of January 3, 2005, would equal the sum of the present value of its accrued dividends, the refund of its issue price, and its allocable share of the remaining proceeds, for a total of $15,426,600. The value of the common stock would equal the remaining $9,073,400 and thereby equal less than 50% of the total value of FishNet Security.

Respondent's expert, on the other hand, calculated the value of FishNet Security without consideration for the liquidation preference. In her report, Ms. Matheny explained that liquidation value presumes that the business will no longer be ongoing and is therefore considered when the underlying assets are worth more individually than as parts of a going concern. Ms. Matheny did not

**[*45]** use a liquidation methodology in her analysis because on the basis of her investigation of FishNet Security there was no indication that it would liquidate in the near future. Instead, she assumed that FishNet Security would continue as a going concern and calculated the value of the preferred stock using its redemption value.

According to FishNet Security's amended articles of incorporation, the redemption value for a share of the series A preferred stock was the greater of (i) the series A issue price, plus any declared but unpaid dividends, and (ii) fair market value. The series A issue price was $10.5 million, but the fair market value was 35.19% of $32 million, or $11,260,000, rounded. Although the remaining value would be attributed to the common stock, after applying a marketability discount Ms. Matheny determined that the common stock had a value of $14,518,000, or more than 50% of the value of FishNet Security, as of January 3, 2005.

The Court evaluates expert opinions in light of all of the evidence in the record, and the Court is not bound by the opinion of any expert witness. Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); Shepherd v. Commissioner, 115 T.C. 376, 390 (2000), aff'd, 283 F.3d 1258 (11th Cir. 2002). The Court may reject, in whole or in part, any expert opinion. Estate of Davis v.

**[*46]** <u>Commissioner</u>, 110 T.C. 530, 538 (1998). Although the Court found Mr. York's testimony and report to be generally credible, his application of the liquidation preference in determining the value of the series A preferred stock to these facts is misdirected. While the Court agrees that the value of a share of stock depends in part on the demands that the holder of that stock may make on the cash available for distribution, a hypothetical liquidation immediately after closing on the stock purchase agreement is not the best test for determining the respective values of the common and preferred stock of FishNet Security.

Mr. York's proposed valuation and liquidation, for example, do not account for the immediate distribution of $9,463,327 to the common stockholder, Fish Holdings, on January 3, 2005. Ignoring the distribution distorts the respective values of the common and preferred stock by giving $10.5 million to the preferred stockholders, plus an immediate return on their investment of 35.19%, while failing to attribute the $9,463,327 distributed to the common stockholder on the same day. The Court finds that this imbalance of value between the preferred and common stock is even more egregious given that value was incrementally stripped from FishNet Security and given to Fish Holdings during the weeks leading up to

[*47] stock purchase agreement closing.[35]  Therefore, on the facts in this case, if $10.5 million is attributed to the preferred stockholders before allocating the remaining value of FishNet Security among the preferred and common stockholders, then the common stockholder's $9,463,327 dividend that was distributed on the same day must also be taken into account.

Accordingly, the appropriate valuation of the series A preferred stock as of January 3, 2005, was its redemption price, which was offered by respondent's expert.[36]  Notably, the court in Hermes Consol., 14 Cl. Ct. at 407-408, used the redemption price to calculate the value of the preferred stock for purposes of determining control under section 269(a).  In addition, like the redemption of the series A preferred stock, which could be redeemed starting four years after the stock purchase agreement on January 1, 2009, the earliest the preferred stock in Hermes Consol. could be redeemed was five years after the purchase of those shares.  Id. at 408.  To account for this difference in time, the court applied a

---

[35]For example, FishNet Security distributed to Fish Holdings:  $2.5 million on December 31, 2004; all membership interests of Secure Passage, LLC, a former subsidiary, with assets of $286,486 on November 5, 2004; and a loan to Mr. Fish with a principal amount of $413,244.61.

[36]Even if the Court used a hypothetical liquidation event to determine the value of the common stock, as proposed by petitioner's expert, its value would include the $9,463,327 dividend distribution and therefore would equal more than 50% of the value of FishNet Security on January 3, 2005.

[*48] discount rate. Id. at 408-409. Although Ms. Matheny did not apply a similar discount, she determined that the series A preferred stock had a redemption price of $11,260,000, rounded. She then determined the value of the common stock by attributing to it the remaining value and applying a marketability discount. On the basis of her calculations, the common stock had a value of $14,518,000, or more than 50% of the value of FishNet Security as of January 3, 2005.

The Court finds that the redemption price valuation offered by respondent's expert was more reliable than the hypothetical liquidation presented by petitioner's expert. Using the redemption price valuation, respondent's expert found that the value of the common stock was $14,520,000 and the preferred stock was $11,260,000, rounded. Accordingly, Fish Holdings owned more than 50% of the total value of shares of all classes of FishNet Security's stock as of January 3, 2005, and as a result, Fish Holdings and FishNet Security were related persons for purposes of section 1239.

V. Conclusion

On January 3, 2005, FishNet Security acquired section 197 intangibles, i.e., goodwill, from Fish Holdings in a section 351 transaction, and as a result the section 197 intangibles became amortizable in the hands of FishNet Security, the

[*49] transferee.  Fish Holdings recognized gain in the amount of a $9,462,700 dividend distribution from the transaction, and petitioners reported the gain on a flow-through basis as long-term capital gain.

Section 1239 requires ordinary income treatment of the gain recognized from the sale or exchange of property, directly or indirectly, between related persons, if the property in the hands of the transferee is subject to the allowance for depreciation.  Fish Holdings and FishNet Security are related persons for purposes of section 1239 if Fish Holdings meets either of the two control tests within the meaning of section 1563(a)(1), as modified by section 267.  Fish Holdings must have owned:  (1) more than 50% of the total combined voting power of all classes of FishNet Security's stock entitled to vote, or (2) more than 50% of the total value of shares of all classes of FishNet Security's stock as of January 3, 2005.

For the reasons discussed above, both tests are met, and as of January 3, 2005, Fish Holdings owned more than 50% of the total combined voting power of all classes of FishNet Security's stock entitled to vote and more than 50% of the total value of the shares of all classes of FishNet Security's stock.  Accordingly, on January 3, 2005, Fish Holdings and FishNet Security were related persons for purposes of section 1239, and therefore the $9,462,700 gain Fish Holdings

**[*50]** received from the transaction should have been reported by petitioners on a flow-through basis as ordinary income.

The Court has considered the parties' arguments and, to the extent not addressed herein, concludes that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.